## MISSISSIPPI POWER & LIGHT CO. v. WHITESCARVER et al.
### No. 6790.

Circuit Court of Appeals, Fifth Circuit.
Feb. 2, 1934.
Rehearing Denied March 2, 1934.

Marcellus Green, Garner Wynn Green, and Forrest B. Jackson, all of Jackson, Miss., and R. L. Dent, of Vicksburg, Miss., for appellant.

J. F. Barbour, of Yazoo City, Miss., for appellees.

Before BRYAN, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

On this appeal from a recovery of $7,500 for the negligent electrocution of one Whitescarver, the Mississippi Power & Light Company assigns as error the exclusion as evidence of an extract from a book and the refusal to direct the verdict in its favor. The declaration alleged as negligence among other things that the company maintained its power wires, carrying 13,000 volts, at an insufficient height where the death occurred, and that its representatives who were present just beforehand and knew what Whitescarver was about to do and the danger in it did not stop or warn him, and he, being ignorant of the danger, brought a metal pole which he was erecting against or near a wire and was killed by electricity from it. The outline of the evidence is as follows: Three power lines, bare and carrying 13,000 volts of electricity, were strung by virtue of a public franchise on common looking poles along the

paved highway at the line of the adjoining fields and at a height between poles of 19 feet and 4 inches from the ground at a locality about one-half mile from the edge of the city of Leland. In the city and up to a few hundred feet from this place the poles were higher and were again higher just beyond it. A few weeks before Whitescarver's death the land in the vicinity, formerly a cotton field, had been cut up into lots and was auctioned off, and one Carollo had bought lots adjoining the highway and on them was building a home and a gasoline filling station. A week before the death of Whitescarver, Carollo had requested the Power & Light Company to arrange connections to light these buildings, and on the day previous to the death two linesmen were sent who strung the light wires to the buildings and installed on a pole near the filling station a transformer to reduce the voltage of the current for the lights. On the fatal morning, before these men left, Whitescarver, who was an employee of an oil company, arrived with a metal pole which, with the advertising sign at its top, was over 22 feet long, and he began digging a hole in which to plant the pole on the edge of Carollo's lot directly under the wires. This was seen by the linesmen of the company, and one of them says he gave Whitescarver warning that the wires carried a heavy voltage and were dangerous. The other testified he neither gave nor heard a warning, but he was in the filling station part of the time and it might have been given without his hearing it. Others working near at hand for Carollo say no warning was given in their hearing. A negro painter, Graves, testified that Whitescarver came to him at the rear of the filling station to borrow a ladder to use in raising the pole and asked him to help, and that he refused, stating that the wires were dangerous. He says he followed Whitescarver to the spot, however, and saw the occurrence. Carollo testifies that he got the ladder and Graves said nothing to him, but stayed behind the filling station where he was painting. Several others testify that Graves was painting there and did not come to the front until after the occurrence and then asked what had happened. Carollo and all the others say they were ignorant that the wires carried a heavy voltage and were dangerous or they would not have helped raise the pole, and that just before raising it one of them asked Whitescarver if there was danger in touching the wire and he answered that it would only tickle them if touched. As they all were raising the pole to place it in its hole, it touched a wire or came so near it

that the electricity leaped to it. Whitescarver and another were instantly killed and three were shocked and burned. There was much varying testimony as to the usual and proper height for high voltage wires, that for the plaintiffs being that 22 feet was the minimum along rural highways, and that for the company placing the safe minimum at 18 feet. All agreed that they should be higher where there were buildings or other likelihood of their being touched. The company's superintendent in charge of these lines testified that he sent the two linesmen to put in the transformer and that if they saw any construction going on near a wire and that the wire was too close to the ground for safety, it would be their duty to report it, but not to raise the wire, and their instructions were to remain there until someone should come to help them clear up a hazardous condition.

█ On this testimony the court properly refused to instruct the jury to find for the defendant. He did tell them that Whitescarver was negligent, and that they must reduce the recovery, if any, accordingly, but left it to them to decide whether the company was also negligent and its negligence a proximate cause of the injury, and whether or not Whitescarver was warned, and, if so, whether his own rashness was not the sole cause of his death. Section 511 of Mississippi Code of 1930 provides that the negligence of the person injured shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to him. Section 512 is that all questions of negligence and contributory negligence shall be for the jury to determine. We agree with appellant's contention that the latter section is not binding in a federal court, but deals with the functions of judge and jury as to which federal courts have their own organization and as to which state law is without effect. Herron v. Southern Pacific Co., 283 U. S. 91, 51 S. Ct. 383, 75 L. Ed. 857. Section 511, on the contrary, is a part of the substantive law of the state under which the homicide occurred, and by which the case concerning it must be tried. 28 USCA § 275. The appellant, therefore, was not entitled to a verdict because the judge held Whitescarver guilty of negligence. The evidence does not demand a verdict that he alone was to blame. It is not established beyond dispute that he knew, or was warned, that the wires were dangerous. The negro painter is flatly contradicted on many material matters by several witnesses, and the

jury might find him to be impeached. The lineman who says he gave warning is not disinterested, but exculpates himself as to a transaction with a dead man. He did not in fact appear as a witness and could not be cross-examined, but a written statement of what he would testify if present was read by agreement. He gives no details of place and persons present when he gave the warning before leaving, but indicates that one Bussey was there. Bussey testifies that he was working with Whitescarver all the time except for an absence of twenty-five minutes, and did not hear any warning and did not know that the wires carried a high voltage. None of the others heard it. The jury were not bound to believe it was given, for it is almost unbelievable that Whitescarver would afterwards have undertaken to raise among such wires a metal pole which was longer than the wires were high, or would have assured his helpers as he did that there was no danger. Nevertheless we agree with the judge that he was, if ignorant, still negligent in not ascertaining what the bare wires he was about to work among held in the way of danger. Touching the negligence of the company we do not think the height at which they were maintained and the question of what danger in general ought to have been anticipated is of greatest importance in this case. Their height was known to Whitescarver. His impending effort to raise a pole of greater length than their height right under them was known to the linesmen before they left. They knew the wires were dangerous and had instructions to remain with a hazardous situation until the hazard was removed. They left without taking any steps to avoid an injury, and as the jury might find, even without a warning of the danger. The dangerous charge of electricity was the efficient cause of the death. The jury might well find that negligence on the part of the company's employees in not guarding against a peril not merely possible but developing before their eyes contributed proximately to produce the injury along with the negligence of Whitescarver in raising the metal pole among the wires without ascertaining their character. The verdict appears to be one for reduced damages.

 Error is assigned on the exclusion as evidence of "National Electric Safety Code, 4th Ed., dated Dec. 31, 1926, issued by the United States Department of Commerce, Bureau of Standards, as shown by transcript pages 118–120 and especially page 100, Table 1, showing the minimum vertical clearance of wires above ground or rails for electrical construction." The full substance of the rejected evidence is not quoted in the assignment as required by our rule XI. The pages of the transcript referred to show that page 101 instead of page 100 was offered, and there is no setting forth there of the evidence. The judge has ordered sent up as an original document what purports to be the code referred to, but we greatly doubt the propriety of thus perfecting a bill of exceptions. We might well refuse to consider the assignment. Price v. United States (C. C. A.) 68 F.(2d) 133; Florida Railroad Co. v. Smith, 21 Wall. 255, 22 L. Ed. 513. But both parties seem to understand that what was offered was a single item purporting to show that for wires carrying 750 to 15,000 volts the vertical minimum clearance along roads in rural districts should be 18 feet. An expert witness was on the stand when the book was offered, and testified that in his opinion a minimum of 18 feet was permissible. He identified the book as one issued by the Bureau of Standards, "but the Government did not put its official stamp on it." He did not refer to it as supporting his opinion, or testify that it was accepted by electrical experts as standard. The book itself was offered as evidence in chief. It is conceded that the Bureau of Standards has no power to regulate the placing of electric wires, and that the book has no compulsive force. It was issued under permission of 15 USCA § 274, as "Information which may be of value to the public." No law required it. It represents merely the opinion of the compilers, and its preface states that as to many matters there are conflicting views, and that especially many changes had been made in this edition touching line construction and that there would be future growth and development, and criticism is invited. It thus appears from the book itself what we should have known anyway, that it deals not with an exact science or mathematical or factual certainties, but with a controversial and developing science in which opinions may vary and experience work great changes. Books in such a field are like medical works rather than like almanacs, mathematical tables, approved histories, census compilations or weather reports. They are at last only the expert opinions of the authors, delivered not under oath nor subject to cross-examination, without opportunity to qualify or explain them, and really without certainty that the author still adheres to the opinions expressed when the book was written. The leading case

in America for rejecting scientific books as primary evidence is Ashworth v. Kittridge, 12 Cush. (Mass.) 193, 59 Am. Dec. 178. The rule is established in Mississippi, Tucker v. Donald, 60 Miss. 460, 45 Am. Rep. 416, and generally elsewhere except in Alabama. Union Pacific R. R. v. Yates (C. C. A.) 79 F. 584, 40 L. R. A. 553; 10 R. C. L., Evidence, § 364; 22 C. J., Evidence, 829; note, 19 Ann. Cas. 999. There was no error in rejecting the evidence offered.

Judgment affirmed.