FOUR-COUNTY ELECTRIC POWER ASSN. *v.* CLARDY.

June 14, 1954

No. 39244 67 Adv. S. 21 73 So. 2d 144

*Snow & Covington,* Meridian, for appellant.

*Roger C. Landrum,* Columbus; *Strong & Smith,* Louis-
ville; *L. W. Brown,* Starkville, for appellee.

414

416

ETHRIDGE, J.

Appellee, George Clayton Clardy, initiated this suit in the Circuit Court of Winston County against appellant, 4-County Electric Power Association. It was for dam-

ages for personal injuries received by Clardy, a well driller and repairer, when he came in contact with appellant's high powered electric line located over a well. The jury returned a verdict of $75,000 for appellee, and from the judgment based on that verdict this appeal was taken.

Appellant is a corporation domiciled at Starkville, Oktibbeha County, Mississippi, and is engaged in the business of operating high powered electric transmission lines and selling electricity to its members in seven counties. Its principal office is in Columbus, Lowndes County. In 1944 appellant bought an easement across the farm land involved in this case, which will be called the Regenold Farm, located in Lowndes County. Appellant was authorized to construct and operate an electric distribution or transmission system on this property. The easement deed did not describe any particular location for the line. This was left in the discretion of appellant, the instrument stating, "it is understood . . . that the location of the poles will be such as to form the least possible interference to farm operations, so long as it does not materially increase the cost of construction."

Appellant afterwards constructed on the Regenold Farm its electric transmission line, carrying 7200 volts, which terminated at a pole approximately 140 feet southeast of the residence on that farm, and 34 feet 9 inches southeast of the well. From this pole, upon which there was a transformer, low voltage insulated wires were run to the residence in order to supply it with electricity. Low voltage insulated wires were strung from the residence to a pole located a few feet from the deep water well situated near the house, and the same type of wires was strung from that pole to an electric pump on the well. This well was from 300 to 400 feet in depth, and was used to supply the landowner with water for his home and stock. The well did not have a pump house over it. The electric pump was exposed on top of the concrete foundation over the well, which was one foot

thick and about four feet square. Two wires lead to this pole, which dead-ended the transmission line on the Regenold Farm. The pole was 30 feet in height. The high powered line to this pole was made of uninsulated copper wire, which had turned black by exposure to the weather.

Some time after appellant's transmission line had been constructed on the Regenold farm and dead-ended there, an adjoining landowner desired electricity for his place also, so appellant then extended its transmission line from the terminal pole on the Regenold farm to the new customer in order to serve his place. When appellant made this extension of service, it continued in a north-western direction its high voltage, uninsulated transmission line, at a height of approximately 25 feet above the ground and approximately eighteen inches west of a perpendicular plane from the well. In other words, the wire lacked only eighteen inches of being directly over the center of the well and was approximately 25 feet above the ground. This transmission line also had a lower, neutral wire which did not carry electricity and which was about three and one-half feet below the primary line which carried 7200 volts. Apparently appellant's high powered transmission line had been over the well for several years when appellee was injured in 1951.

This well was from 300 to 400 feet in depth, which was a customary depth. Many wells have electric pumps on them and like the present one usually contain several sections of pipe of 21 feet in length, extending from the pump down to the water under the ground. These sections of two-inch pipe were each 21 feet in length, and located inside the two-inch pipe was a smaller pipe or rod serving as a pump rod, which was in sections varying from 18 to 21 feet. Attached to the pump rod was a cylinder.

There were two methods used in this territory for repairing a well. One was by hand, where the repairmen would remove the pipe manually. They would pull the

pipe out of the well in sections, up to where the joints were at approximately waist level. With wrenches they would then unscrew the sections of pipe one at a time. Since the joints of the inside pump rod would not usually be at exactly the same place as the joints on the larger pipe, it ordinarily was necessary to elevate the 21-foot sections of the two-inch pipe somewhat higher than waist level in order to unscrew the pump rod inside of it. And this process would raise the pipe sections over 25 feet in the air.

The other, customary method of repairing wells in this area was by the use of a derrick. Appellee, George Clardy, and his brother, Walter Clardy, were well drillers and repairers, doing business as Clardy Brothers. Appellee, at the time of the accident, was 22 years of age, and helped his brother Walter in this business. Walter, who was 24, apparently was the leader and the one who was more familiar with this type of work. Walter Clardy and appellee owned a derrick which was erected upon the rear of a truck. Their derrick was 30 feet in height, at the top of which was a pulley. This derrick-ladder was in two sections, which lay prone upon the truck until extended by a motor. After it was extended, it was necessary for someone to climb up on the derrick and attach metal braces to each side of the ladder. A rope would be then run through the pulley at the top of the derrick. The rope connected to the pulley is used to pull the pipe from the ground by sections, disconnecting each section when the joints are raised above the ground to a point where they can be conveniently unscrewed.

In the early part of 1951 Mrs. S. A. Regenold bought the farm in Lowndes County previously referred to and over which appellant's high powered transmission line ran, crossing almost directly over the well. Mr. Regenold was managing the farm for his wife. On March 6, 1951, he talked to Walter Clardy and appellee George Clardy about repairing the well. Regenold said that Walter told him they would have to see the well, so he, Walter Clardy

and appellee drove out to the farm in Regenold's car. Walter and appellee looked at the exposed part of the well. Regenold testified that in the presence of appellee, Walter Clardy told Regenold that he would have to pull the pipe in the well to find out what repairs were needed before he could give Regenold a price for the job; and that Walter also looked up at the wires above the well and said that he would have to see "if the rig will clear those wires." Appellee denied that any such statements were made. He stated that he saw the wires above the well and knew they were electric wires, but he thought that they were low voltage, insulated "house wires" like the others running from the pole near the well. Appellee testified, as did Regenold and several other witnesses, including two electrical engineers from the University of Alabama, that the copper wires in the transmission line had turned black from long exposure to the weather, and that one looking at them could not tell the difference between them and the insulated, low voltage wires running from the pole near the well. There was some dispute on this question, but the great weight of the evidence supported the jury's manifest finding that both types of wires looked almost exactly alike.

After George and Walter Clardy had looked at the exposed part of the well with Regenold, they left and Regenold went out into his pasture to do some work. In the meantime the Clardys returned with their truck upon which the well derrick, made of metal, was situated. Appellee started taking apart the old pump on top of the concrete block over the well. Walter Clardy backed the truck up to the edge of the well, with the derrick immediately over it. He and appellee then raised the derrick, and appellee facing the rear of the truck climbed up the ladder of the derrick, for the purpose of bolting a long metal brace onto each side of the ladder. Approximately eighteen inches to two feet away from appellee's left side was the high powered transmission wire. Appellee reached around the derrick with his right hand, and with

that hand was holding the left side of the derrick, together with a bolt on the left side which extended to the exterior of the ladder. He was undertaking with his left hand to screw the nut onto the bolt on the left side of the ladder, when in some unascertained way the electricity entered appellee's body, burning him severely and knocking him off the derrick. He fell 25 feet to the ground. Appellee testified, ''some way, I don't know, the derrick could have swayed or the wind could have blowed the wires a lot, anyway the wire burned me.'' Appellee wore on his left wrist a wrist watch with a metal band. Among his injuries was a terribly burned indentation all around that wrist, which practically disabled his left forearm and hand. So the electricity could have reached appellee by arcing to the metal wristband, or the derrick could have swayed slightly, or the wind could have blown the line. At any rate, when the 7200 volts entered appellee's body, his head was thrown against the wire, because on the left side of his head there is a deep scar around four inches in length, which destroyed at that point the scalp and part of the cranial bone.

Appellee testified that he understood very little about electricity, but that he knew that it would hurt him under certain conditions. He had never done any electrical work or made any study of electricity. He said that there was no warning sign around the post or well in question; that he thought the wire was insulated and ''just these little old house wires''; that the black coating or color of the wire was the same as the insulated, low voltage wires; and that the house wires also were leading from the post near the well. Appellee testified that because of that appearance and the impression which he had obtained that the wire over the well was also a low voltage, insulated wire, he went upon the derrick to attach the braces to it. He thought that the wire was about two feet from the derrick. He knew it was there, but he was concentrating on fixing the derrick. He did not intend to touch the wire.

Appellee was injured on March 6, 1951. On April 8, 1953, he filed this suit in the Circuit Court of Winston County. The declaration charged that defendant was negligent in constructing and maintaining its high powered lines over the well on the Regenold farm; that the law requires the highest degree of care of one handling the transmission of high voltage electricity; that defendant could reasonably foresee that the well would need repair and cleaning out from time to time, and that this would be done by the usual and customary methods of repairing wells; and that defendant's failure to exercise the required degree of care in constructing and maintaining its line was negligence which proximately resulted in appellee's injuries. Defendant in its answer denied any negligence, and asserted that it had constructed its transmission line in the usual and customary manner. Defendant pleaded that the plaintiff's own negligence in placing his derrick near the wire and in climbing upon it in that position was the sole, proximate cause of his injuries; that plaintiff assumed the risk by placing himself in close proximity to the wire knowing the danger; and that even if defendant were negligent in placing its wire over the well, still the plaintiff's negligence was the independent, intervening, sole, and proximate cause of his injuries. After a lengthy trial the jury returned its verdict for plaintiff-appellee for $75,000.

The jury was fully justified in concluding that appellant was negligent in constructing and maintaining its high powered electric lines almost directly over the well on the Regenold farm. Persons operating electrical systems transmitting deadly currents of electricity are required to exercise the highest degree of care in their construction and maintenance. Farmers' Gin Company v. Leach, 178 Miss. 784, 174 So. 566 (1937); Laurel Light and Railway Company v. Jones, 137 Miss. 143, 102 So. 1 (1924). The great weight of the evidence supports the jury's conclusion that appellant was negligent. Appel-

lant knew or should have known that deep water wells in that area usually contain sections of pipe 21 feet in length, that these wells from time to time need repair, and that according to the customary methods of repair there is a serious danger that, if a wire were placed over the well, a person repairing it by pulling the pipe and using a derrick would probably come in contact with the wire; that if the work was done it was probable that a derrick at least 30 feet in height would be used, and a repairman would have to go up on the derrick to do some of the work. Appellant should have reasonably anticipated that someone working on or about the well in repairing it would likely come in contact with appellant's transmission line. Two electrical engineers from the University of Alabama testified that appellant's line was not sufficiently high for purposes of safety and that in effect it was not placed in accordance with good construction practices in the industry. An electrical contractor of considerable practical experience testified substantially to the same effect, as did several other expert witnesses. One of appellant's own expert witnesses, R. V. Taylor, said that if it is practical to go to the right or left of a well, the wire should not be placed over but away from it. G. L. Simmons, a well driller and also a witness for appellant, said: "It is bad business for a line to be over a well." It is undisputed that appellant could have constructed its line to either side of the well with no difficulty.

Decisive of this conclusion of appellant's negligence is the recent, somewhat similar case, of Southern Pine Electric Power Association v. Denson, 214 Miss. 397, 57 So. 2d 859 (1952). Stringer and his wife were killed while he was undertaking to remove by hand a 21-foot section of pipe from the well on his farm. The high powered line was 25 feet above the ground, and was three to six feet off the perpendicular from over the well. A judgment for Stringer's administrator, Denson, was affirmed. It was

held that an accident of this sort should have been reasonably foreseen by the defendant. The Court said: "Electricity is a highly dangerous agency, and it must be denominated negligence to erect so close to the well a high voltage line, unless insulated, or unless, in the exercise of the highest degree of care, it was strung high enough off of the ground reasonably to prevent injury to him."

However, appellant argues that even if it were negligent in placing its transmission line over the Regenold well, still the sole, proximate cause of appellee's injuries was his own negligence in climbing the derrick-ladder and in placing himself so close to the wire that in his own carelessness he was injured; that these negligent acts of appellee were an independent, intervening cause of his injuries, of such a nature as to eliminate the effect of any negligence of appellant; that appellee assumed the risk that he might be injured when he mounted the derrick knowing it was in that position; and that therefore there was no causal connection between appellant's stringing of the wires over the well and appellee's injuries.

The trial court was correct in refusing instructions requested by appellant which told the jury that appellee was negligent as a matter of law. Whether under the circumstances outlined above appellee was contributorily negligent and if so, the extent to which it affected appellant's liability were questions for the jury. Appellant obtained an instruction on contributory and comparative negligence, as did appellee. Moreover, appellant was granted a total of sixteen well drawn instructions, fully setting forth appellant's position. Seven of them dealt with the theory of sole, proximate cause and two with assumption of risk. Whether there was an independent, intervening cause of appellee's injuries, wholly disconnected from and having no causal relation to appellant's negligence, was a question which was properly submitted

to the jury. 38 Am. Jur., Negligence, Secs. 67-72; Magers v. Okolona, Houston & Calhoun City R. Co., 174 Miss. 860, 165 So. 416 (1936). And whether appellee knew, appreciated and deliberately exposed himself to the danger, and thereby assumed the risk of his injuries was on this record also an issue for the jury. Saxton v. Rose, 201 Miss. 814, 29 So. 2d 646 (1947); Miss. Power & Light Company v. Goosby, 187 Miss. 790, 192 So. 453 (1939); Miss. Power & Light Company v. Whitescarver, 68 F. 2d 928 (C. C. A. 5th, 1934).

 We find no error in the trial court's granting and refusal of certain instructions. The instructions given appellee set forth the principle of reasonably foreseeable danger and injuries. Nor was there any error in one of the instructions referring to the other instructions for a definition of negligence. City of Meridian v. King, 194 Miss. 162, 175, 11 So. 2d 205 (1942). It is also argued that this instruction negatived appellant's defenses of intervening cause and assumption of risk. But of course it must be read along with the numerous other instructions granted appellant setting forth its defenses. We find no error in the refusal of certain instructions requested by appellant. Our conclusions that the questions of contributory negligence and of assumption of risk were for the jury explain our reasons for this view. Plaintiff was granted seven and defendant sixteen instructions. They must all be read together. They are all well drawn and clearly set forth the respective positions of the parties.

 Appellant contends that the verdict of $75,000 is so grossly excessive as to evince bias, passion and prejudice on the part of the jury. In support of this argument, appellant's brief cites a number of past decisions in which remittiturs have been entered. But of course each case must be decided on its own facts. Appellant cannot seriously assert that the facts as to appellee's injuries fail to support the verdict. The opinion of the trial court

in overruling the motion for a new trial expresses our view: "There is no question but that he is permanently and totally injured. In fact, he is the most maimed and mutilated man the court has ever seen in the courtroom. This man is ruined insofar as his injury is concerned."

A brief summary of appellee's terrible injuries is as follows: There is a deep scar on the left side of his head and face approximately three and one-half to four and one-half inches in length, where the scalp and part of the bone of the cranium were destroyed. This area is draining and will continue to grow worse. The upper portion of his left ear is sheared off. The skull injury has caused damage to the nerves, which results in dizziness, vertigo and epilepsy. Appellee has had an epileptic convulsion, which was caused by the injury to his brain. He has developed cataracts in both eyes, and is industrially blind in the right eye. He can get some relief by an operation on both eyes. This would give him reasonably good vision straight ahead but not to the side. Such an operation would cost around $2,500. A deep scar encircles appellee's left wrist where he was wearing a metal wrist watch band. This scar adhered to the underlying tissues, and the injury totally disabled the thumb and the next two fingers on the left hand. The other two fingers have about twenty per cent of their normal strength. The left wrist is carried at almost a right angle position. From the accident appellee has developed arthritis in his neck, spine and back. The nerves in his back and the pubic nerves were injured. He has been rendered sexually impotent. His left leg has a large scar caused by the electrical burn, about three and one-half to seven inches in size, which at the time of the trial was still very painful. His right knee is dislocated, and the tendons and ligaments supporting it are destroyed, so that he has no real control over its functioning, and has developed traumatic arthritis in that area. Because of arthritis in his neck, spine and back, appellee is unable to stoop over and

pick up anything. His spine and neck are rigid. The trial of this case took place about two and one-half years after the accident. During all of this period he has suffered continually from headaches. His right knee hurts him at all times, and it is very difficult for him to walk. He cannot sleep over three or four hours a night because of the pain caused by the injuries. From time to time he has more severe attacks of pain which require him to stay in bed for several days at a time. A doctor testified that the injury to appellee's head results in constant, severe pain, as does the arthritis in his neck and spine. Appellee was a healthy young man before the injury, weighing one hundred and fifty-five pounds. He enjoyed going to ball games, picture shows and having dates like others of that age. He now is most retiring and avoids people. He is pale, emaciated and in a weakened condition. Dr. Pierson testified that he was unable "to do anything," any kind of work, and his condition would grow worse; and that a brain concussion "is frequently followed by psychosis." His pain and suffering for the several months he spent in the hospital after the injury were excruciating, and they have continued in a severe form. Dr. Pierson testified that this would so continue in the future indefinitely. In brief, appellee is totally and permanently disabled.

Appellee was 22 years of age at the time of his injury, with a life expectancy of forty-one years. He was earning $250 per month, or $3,000 per year. His loss of earnings up until the time of the trial was $7,000. His life expectancy from the date of the trial was thirty-eight years and eight months. His future loss of earnings not commuted would aggregate $116,000. That amount commuted to its present value at an annual interest rate of four per cent would be $58,103.70. Hence his total loss of earnings, past and future, undisputed in this record, is $65,103.70.

His medical expenses up until the time of the trial were $3,204.00. His probable future medical expenses would be at least $10,000. Hence his aggregate, undisputed medical expenses, past and future, are $13,204. The total of his undisputed past and future medical expenses and loss of earnings is $78,305.70, which alone exceeds the verdict rendered without allowing appellee anything whatever for pain and suffering, which were excruciating, and which the doctor said would continue into the future. So, in view of the undisputed nature and extent of appellee's injuries and damages, we certainly cannot say that the verdict was so excessive as to show that the jury was affected by passion, prejudice or bias. We have previously said that whether appellee was contributorily negligent was a question for the jury. But assuming that he was contributorily negligent, and that the jury should have mitigated the damages against appellant to the extent of appellee's negligence, still on these facts the jury's verdict is amply supported by the record.

In the opening statement to the jury and the arguments of appellee's counsel, his attorneys produced and referred to a chart prepared by them. This chart was about five feet long and four feet high, made of heavy white paper. On it there was written in black ink appellee's name, age, life expectancy, his loss of earnings, and medical bills, past and future, and "pain, suffering, and mental anguish, $5 per day," calculated on the basis of the number of days up to the time of the trial, and on the remainder of appellee's life expectancy. At the end of the chart there was totaled the entire monetary damages claimed by appellee. The chart was not introduced into evidence by appellee, but was offered by appellant for the purpose of preserving its point concerning it.

Appellant contends that it was reversible error to permit appellee's counsel to refer to this chart in the opening statement to the jury and in the arguments. However, we do not think that was error. All of the figures

stated in the chart, except those with reference to pain, suffering and mental anguish, were supported by some evidence in the record. The declaration itself contained the total amount of the demand, and enumerated the various items of damages claimed by plaintiff. Miss. Code 1942, Section 1526, provides: ''Before the introduction of the evidence the plaintiff may briefly state his case orally to the jury, and the evidence by which he expects to sustain it; and then the defendant his case, and the evidence by which he expects to support it.'' Plaintiff's counsel has a right to state his case orally and to outline the evidence by which he expects to sustain it. He would have a right to state orally and in detail what damages he expected to prove, and he would have the right to take a pencil, list those items of damages, and show that sheet of paper to the jury in the opening statement and arguments. So we cannot see any reason why counsel should be denied the equivalent right to prepare in advance a chart outlining what he expects to prove, and to use it in the opening statement and in the arguments. ██ With reference to the figures claimed by appellee for pain, suffering and mental anguish, there was no evidence on any monetary amount, but the undisputed record showed that appellee suffered and will continue to suffer excruciating and long-continued pain. Counsel had the right to state to the jury what he thought would be proper damages for the jury to award for this item, in his opening statement and arguments.

On motion of defendant, the chart was removed from the courtroom after plaintiff's counsel had completed his opening statement and before that of defendant's attorney. During the direct examination of plaintiff the chart was brought back into the courtroom, at the request of plaintiff's counsel. The court overruled defendant's objection to the chart being brought back in, but stated for the record that the chart ''has been turned around so the jury cannot see it.'' The record further reflects

that at the end of plaintiff's direct examination the chart was taken out of the courtroom again. Appellant argues that the chart was in the courtroom and visible to the jury during a part of the testimony of appellee's witnesses. However, the record is not clear on this, and the statements in the record referred to above indicate that, during the period when the chart was in the courtroom while testimony was being produced, it was turned to the wall and away from the jury. It is not proper for a chart of this sort, prepared by counsel for use in opening statements and arguments, to remain in the courtroom where the jury can see it during the trial and testimony of witnesses. It should not be kept before or within the vision of jurors during the trial of the case. Its use should be limited solely to opening statements and arguments. And when counsel has finished his statement or argument, it should be either removed or turned away from the jury's vision, so that opposing counsel may then present his points fairly and without visual interference from the chart. See Hinshaw, Use and Abuse of Demonstrative Evidence, 40 A. B. A. Jour. 479, 542 (June, 1954); Belli, Demonstrative Evidence and the Adequate Award, 22 Miss. L. J. 284, 306-323 (1951).

In Clisby v. Mobile & Ohio R. R. Co., 78 Miss. 937, 29 So. 913 (1901), Clisby sued the railroad for the value of cotton destroyed by fire, allegedly through the negligently and improperly constructed apparatus of defendant's locomotive. A judgment for defendant was affirmed. Plaintiff argued that the trial court erred in permitting defendant's counsel in argument to show to the jury a diagram of a locomotive which had been minutely described in evidence in words. It was there said:

"When objection was made to the use of this diagram the presiding judge instructed the jury that it was not evidence and refused to allow it to be carried into the jury room when they retired. The counsel using it disclaimed its being evidence. We cannot say this was error.

A proper latitude must be granted counsel in arguing the cause, under the oversight and in the sound discretion of the trial court. The diagram was a pictorial illustration of what the witnesses had said on the stand. This is a day of illustrations, in recognition of the fact that the eye may often be a better medium of enlightening the mind than the ear. Counsel, within the record, should be allowed the best lawful means of bringing the jury to a correct understanding of the cause.''

In Haley v. Hockey, 103 N. Y. S. 2d 717 (1950), the following occurred: ''Counsel for defendant objected during the summing up of plaintiff's counsel to the use of certain figures placed upon a blackboard, illustrative of plaintiff's claims for damages. The court caused the figures, so placed, to be erased from the board immediately upon conclusion of the summation and before the jury was charged. In view of the fact that the blackboard has been handily placed for the use of all counsel in Jefferson County, and that both sides have, by well-known custom, used the same for many years, the court cannot find that defendant's rights were prejudiced in this case.''

In J. D. Wright & Son Truck Line v. Chandler, 231 S. W. 2d 786, 789 (Tex. Civ. App. 1950), it was contended that the trial court erred in permitting plaintiff's counsel to argue that for pain and suffering plaintiff should be allowed damages at the rate of $2 per day. The Texas Court observed that ''counsel may in argument to the jury suggest and state what he believes the evidence shows in the way of a damage award; . . .''; and that counsel may draw deductions as to the extent of pecuniary damage, within the confines of the evidence. Birks v. East Side Transfer Co., 241 P. 2d 120, 135 (Ore. 1952), involved a suit for damages arising out of a motorcycle collision. The court approved the use of a blackboard in explaining to the jury the testimony of witnesses and in the arguments. In the instant case, the learned

trial judge observed in his opinion on the motion for new trial that attorneys in his court have been using charts and blackboards in opening statements and arguments "for a long time." When so limited for those purposes, we think that they are permissible aids to setting forth clearly the positions of the litigants.

We do not find any merit in the other assignments of error.

Affirmed.

*Hall, Lee, Kyle, Holmes* and *Arrington, JJ.,* concur.

*Gillespie, J.,* took no part.

ROBERDS, J., dissenting in part.

I do not think the chart of claimed damages should have been mounted and spread before the jury when the opening statement of plaintiff was being made. The chart is some four by five feet, on heavy cardboard, with large black letters and figures on a white background. It enumerates the damages, past, present and future, under various headings, such as, for instance, "PAIN, SUFFERING, AND MENTAL ANGUISH $5.00 PER DAY, 28 MONTHS OR 840 DAYS AT $5.00 PER DAY —$4,200.00." That was an estimate for past damages. It contains another heading similar to this for future pain, suffering and mental anguish, estimated for " * * * 38 YEARS AND 8 MONTHS, OR 13,920 DAYS AT $5.00 PER DAY—$69,600.00." There are other glaring headlines, such as "PAST DAMAGES" and "FUTURE DAMAGES," giving the time which has been and will be covered and the elements of the damage. Now, this was at the very beginning of the trial of the case. No testimony had been offered of the enumerated damages. Indeed, none would have been competent at any time as to some of them, for instance, the daily damage for pain, suffering and mental anguish. Estimating that damage was a matter for the jury. No witness would have been permitted to give his estimate of that damage. Of course,

at that stage, no evidence had been given as to who prepared this chart. For all the jury knew, or may have thought, it had been prepared by some doctor, or under direction of one skilled in medicine. No opportunity had been given for cross-examination or to test the accuracy of these estimates. Of course, the purpose of it was to influence and make as profound impression as possible on the minds of the jurors at the very beginning of the trial. This chart maneuver is becoming frequent in the trial of damage suits in Mississippi, and, judging by the size of the verdicts, is having its effect. It is an evidence of diligence on the part of counsel for plaintiffs, but, in my view, is not a method which should be approved by this Court, whose sole duty is to hold the scales of justice evenly balanced insofar as humanly possible. In any event, if such chart is to be used at this stage of the trial, the estimates and figures thereon should be confined to elements and factors which, at least, are susceptible of proof. What has been said has no reference to the use of such a chart in the argument to the jury after the testimony is in, provided the elements and amounts are supported by the evidence. However, as stated, estimates of money damage for daily suffering, past, present or future, would not have been competent for any witness to give at any stage of the trial. That was a matter for the jury.

Clisby v. Railroad, 78 Miss. 937, 29 So. 913, is not authority for use of this chart in the manner here used. That was a suit to recover the value of cotton destroyed through alleged negligence of the defendant railroad in the use of a defective locomotive emitting sparks which alighted and burned the cotton. A diagram of the locomotive was introduced. That is an entirely different case from the case at bar. In the first place, this diagram was made of the physical locomotive, depicting its different parts, having a direct bearing upon whether it did or did not emit the sparks, and, in the second place,

it was used in the argument of the case to the jury after the testimony was all in, tested by cross-examination as to its accuracy. In the case at bar no evidence had been introduced, no opportunity for cross-examination had been afforded, and, as to a number of important items appearing on the chart, no testimony was competent.

In my view the amount of the verdict herein should be reduced to $50,000.00. It is clear the jury did not take into consideration the negligence of plaintiff. That he was grossly negligent permits of no doubt in my opinion. He is shown to have been an intelligent young man. He lived in Lowndes County, which is crisscrossed with high powered electric lines. It would appear childish to assume he did not know of such electric lines. He said he did know of the 7,200 volt line. He saw the low voltage lines running from the transformer to the pump and residence. His defense seems to be he thought the 7,200 volt line was insulated. Of course, a line carrying that amount of electricity cannot be insulated. But if he thought when on the ground the 7,200 volt line was insulated, he certainly did not think so when he climbed the steel derrick to within 18 inches to two feet of the high powered line. It was right at him. No one in that position, who looked at the wire, could have thought it insulated. He was some 25 feet above the ground upon a metal derrick, within not over 24 inches of this high powered line. He proceeded to attach metal braces to the metal derrick, all being apt conductors of electricity. He does not know just how he came into contact with the high powered line—whether he was sufficiently close to it for the electricity to jump from the wire to his body or whether his arm touched that wire. In any event it really seems difficult to perceive how one could be guilty of grosser negligence than was the plaintiff in this case. The entire record, it seems to me, shows the jury awarded a judgment in dollars and cents for the full damage,

436

whereas under our contributory negligence statute the damage resulting from the gross negligence of plaintiff should have been deducted therefrom.

*McGehee, C. J.,* joins in this dissent.