# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-00314-SCT

*ENTERGY MISSISSIPPI, INC.*

*v.*

*CAROLYN JANUARY HAYES, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF LAVONNE HAYES, DECEASED; JAVARY LAGMAN JANUARY AND LAVONNE QUINTARIOUS HAYES, MINORS, BY AND THROUGH CAROLYN JANUARY HAYES, MOTHER AND NATURAL GUARDIAN OF JAVARY LAGMAN JANUARY AND LAVONNE QUINTARIOUS HAYES, MINORS; AND ALVONTA PALMER AND TANQUINIKA PALMER, MINORS, BY AND THROUGH BERTHA PALMER, MOTHER AND NATURAL GUARDIAN OF ALVONTA PALMER AND TANQUINIKA PALMER, MINORS*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/21/2001 |
| TRIAL JUDGE: | HON. ISADORE W. PATRICK, JR. |
| COURT FROM WHICH APPEALED: | SHARKEY COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN H. DUNBAR |
| | JAMES W. SNIDER |
| | WALTER ALAN DAVIS |
| ATTORNEYS FOR APPELLEES: | WARREN LEON CONWAY |
| | MARSHALL E. SANDERS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | REVERSED AND RENDERED - 04/22/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, CHIEF JUSTICE, FOR THE COURT:**

¶1. In this wrongful death case, the jury returned a verdict awarding damages to the beneficiaries of Lavonne Hayes, but the trial court reallocated fault and ordered a new trial on damages only. Entergy of Mississippi, Inc. (EMI) appealed the trial court's final order. We find that there was sufficient evidence of liability against EMI to support the jury verdict, that the trial court erred by reallocating to EMI all causal fault allocated by the jury in the first trial to Jim Avis and Associates, Hayes's immune employer, and that the trial court erred by granting a new trial on the sole issue of damages. Therefore, we reverse the judgment against EMI the amount of $6,854,707.02 and render judgment reinstating and affirming the judgment against EMI in the amount of $169,175.00.

## FACTS

¶2. On October 20, 1994, Lavonne Hayes was electrocuted while he was performing renovation work at a sewage lift station in Anguilla, Sharkey County, Mississippi. Hayes and co-worker Jerry Ledlow were guiding a twenty-one-foot pipe with a two-inch diameter into a hole when the pipe made contact with an EMI uninsulated overhead power line, carrying a voltage of 8,000 to 13,000 volts.

¶3. Hayes's widow, Carolyn January Hayes, and his four children, Javary Lagman January ("Bondy") and Lavonne Quintarious Hayes, by and through their mother, Carolyn January Hayes, and Tanquinika Palmer ("Shay"), and Alvonta Palmer ("Roy"), by and through their mother, Bertha Palmer, (Plaintiffs) filed a wrongful death action against Entergy Mississippi, Inc. (EMI) on October 14, 1997, for the death of Lavonne Hayes. The case went to trial on March 22, 2000.

2

¶4. Ledlow testified that he was unaware that there were power lines overhead and that he did not hear anyone give a warning about the power lines to him or to Hayes. No evidence of warning signs on the premises was introduced.

¶5. When the power lines were originally constructed in 1974, they were not directly over the lift station. In 1986, the power lines were moved to their current location. The two live wires over the lift station measured 19.37 feet and 23.17 feet above the ground. The pipe came into contact with the higher of the two.

¶6. The plaintiffs' expert witness was William Adams in the field of electrical engineering. Adams had been a consulting engineer for 44 years and had previously performed electrical design work at Maxwell and Keesler Air Force Bases. He had previously been qualified and had testified as an expert witness in Mississippi courts numerous times. EMI did not present expert testimony to contradict Adams.

¶7. To prepare for his testimony, Adams visited the accident site and reviewed depositions of three people who had been designated by EMI as individuals having relevant knowledge of this case.

¶8. Adams testified that the National Electrical Safety Code (NESC) sets forth minimum safety standards for outside electrical installations. He testified that the NESC minimum clearance standards did not apply to the type of work being performed on the day of the accident, specifically that the twenty-foot minimum clearance standard did not apply in this case. Adams testified that NESC standard 012 applied, which required that "construction and maintenance [of power lines] should be done in accordance with accepted good practice

for the given local conditions." He testified that the minimum clearances "would not apply and that further, safer methods of construction would have to be used."

¶9.    Adams testified that the power line became more dangerous when it was moved in 1986 to a point directly over the sewage lift station. Adams testified that any of the following safety measures could have been employed to reduce the hazard of the power line: insulating the lines, posting warning signs, putting streamers or ball on the lines, burying the lines, or moving the transformers and running low-voltage conductors to the various customers' locations.

¶10.    Additionally, Adams testified about the foreseeability of an accident such as the one in question. He based his testimony on a consultation with a mechanical engineer, who told him "it was not surprising that they were using twenty to twenty-two-foot lengths of pipe to be replaced or maintained, . . . [and] it was not surprising that they got a pipe and a backhoe up into the power line." Adams stated maintenance on the sewage lift station is a regular occurrence. Adams further stated he had received conflicting reports about whether Jim Avis and Associates had notified EMI that work would be performed at the site.

¶11.    The plaintiffs presented extensive testimonial evidence of the relationship each had with Hayes and their suffering as a result of his death in support of their damages claim for loss of love, society, and companionship. Additionally, Mrs. Hayes testified about her physical health problems. Testimony was also offered that Hayes's daughter Shay has schizophrenia and will be dependent on her family for the rest of her life. Finally, evidence

4

was also offered to show that Lavonne, Hayes's youngest child, is permanently mentally disturbed.

¶12.   The case went to the jury, and the jury returned a verdict for EMI.  However, when the jury was polled, less than nine jurors stated they agreed with the verdict.  *Cf*. M.R.C.P. 48(a).  Therefore, the court instructed the jury to continue deliberations.

¶13.   The jury returned with a second verdict that withstood polling.  This verdict awarded damages of $505,000 and apportioned fault three ways: 34% to Jim Avis and Associates (Avis), 33% to Lavonne Hayes, and 33% to EMI.

¶14.   On May 23, 2000, the trial court entered judgment against EMI for $169,175.00.  The plaintiffs filed motions seeking the alternative relief of a new trial on the sole question of damages, a new trial on all issues, the entry of judgment as a matter of law on the liability of Jim Avis and Lavonne Hayes, or for an additur.  They argued that the trial court erred in allowing the consideration of contributory negligence of Jim Avis, because the evidence was insufficient on both issues. EMI also filed a post-trial motion requesting a judgment notwithstanding the verdict.

¶15.   The trial court denied EMI's motion for a judgment notwithstanding the verdict; the court also denied the plaintiffs' motions for additur and for a new trial on all issues. Without ruling the damage award was inadequate, the court ordered a new trial on damages.

¶16.   The trial court ruled that it had erred by allowing the jury to allocate the causal fault of Avis.  The court sua sponte reallocated fault to EMI of 67%.  The court based its ruling

on ***Accu-Fab & Construction, Inc. v. Ladner***, 778 So. 2d 766 (Miss. 2001) (***Accu-Fab***), which the court stated had been released one week before the trial at issue; however, ***Accu-Fab*** was handed down in February of 2001, which is almost one year after the case at hand went to trial. Subsequently, ***Accu-Fab*** was overruled by ***Mack Trucks, Inc. v. Tackett***, 841 So. 2d 1107, 1115 (Miss. 2003) (***Mack Trucks II***) in March of 2003.

¶17.    After the new trial for damages, the jury returned a verdict of $10,230,906.00, upon which the court rendered judgment on November 27, 2001. Of that amount $10,000,000.00 was for the plaintiffs' loss of love, society, and companionship.

¶18.    Following the second trial, EMI filed post-trial motions including a motion for judgment notwithstanding the verdict, an alternative motion to amend the second judgment and reinstate the original judgment, and an alternative motion for a new trial or remittitur. The trial court denied all of EMI's motions.

## ANALYSIS

I.    **WHETHER THERE WAS SUFFICIENT EVIDENCE OF LIABILITY AGAINST EMI TO SUPPORT THE JURY VERDICT.**

¶19.    As to jury verdicts in civil cases, we have said that we will not direct a judgment to be entered contrary to the jury verdict unless we have concluded that "given the evidence as a whole, taken in the light most favorable to the verdict, no reasonable, hypothetical juror could have found as the jury found." ***Busick v. St. John***, 856 So. 2d 304, 307 (Miss. 2003) (citing ***Snapp v. Harrison***, 699 So. 2d 567, 569 (Miss. 1997); ***Starcher v. Byrne***, 687 So. 2d 737, 739 (Miss. 1997)). *See also **Thompson Mach. Commerce Corp. v. Wallace***, 687

So. 2d 149, 151-52 (Miss. 1997) (this Court resolves all conflicts of evidence in the appellee's favor).

¶20.   EMI argues the plaintiffs offered no evidence of the standard of care. EMI bases its argument on the premise that "[i]n a case alleging liability for professional negligence of an engineer, there must be some testimony as to what the standard of care was"; however, the plaintiffs' complaint did not allege the professional negligence of an engineer.   The complaint alleged that public utility EMI and its agents breached the "duty to install and maintain its energized, electrical lines in a manner and elevation so as to insure that those performing foreseeable tasks there under with due regard to their own safety would not come into contact with the same . . ." and that EMI "negligently failed to warn of the danger of its highly energized electrical lines and the dangers associated therewith and negligently failed to isolate, insulate, and guard its lines from those performing such service work . . . ."

¶21.   The plaintiffs' expert witness, Adams, testified as to what the standard of care required, according to the NESC. EMI offered no evidence to rebut the expert's testimony; rather, EMI argues that because the expert did not state the course of action the original designer should have taken, no standard of care was offered.

¶22.   In earlier cases alleging negligence of an electrical power distributor, this Court has not required that an expert testify as to what specific act an electricity distributor would have performed, other than some action that would correct or remove the reasonably foreseeable danger, to establish the standard of care. In *Read v. Southern Pine Electric Power Ass'n*,

515 So. 2d 916, 919 (Miss. 1987), we said,

> With regard to duty, Read alleged and SPEPA admitted that SPEPA was in the business of distributing electricity. As a power company, SPEPA, though not an absolute insurer against injury, was under the highest duty of care in distributing electricity. *Upton v. Magnolia Electric Power Assoc.*, 511 So. 2d 939 (Miss. 1987); *City of Starkville v. Harrison*, 418 So. 2d 51 (Miss. 1982); *Mississippi Power & Light Co. v. Shepard*, 285 So. 2d 725 (Miss. 1973). When a cause of danger is reasonably foreseeable caused by and known to the power company, the company must exercise reasonable care to correct or remove the cause of danger. *Shepard*, 285 So. 2d 729. This standard of care applies whether the injury is to persons or to property. *Mississippi Power Co. v. Luter*, 336 So. 2d 75, 756 (Miss. 1976).

Very recently, this Court decided issues in a case with very similar facts to this case; in *Ware v. Entergy Mississippi, Inc.*, 2003 WL 23096029, *9 (Miss. 2003), we stated:

> "Public policy in Mississippi requires utilities to exercise a very high degree of care in protecting the public from the dangers of electricity." *Entergy Mississippi, Inc. v. Burdette Gin Co.*, 726 So. 2d 1202, 1208 (Miss. 1998); *Shephard*, 285 So. 2d at 729. There is also a duty on power companies to anticipate and guard against events which may be reasonably expected to occur, and the failure to do so is negligence, even though the power company may not anticipate the identical injury that occurs. *Id.* at 729 (citing 29 C.J.S. Electricity § 38, 1058-1059 (1965)).

While the NESC provides minimum guidelines and "the basic provisions that are considered necessary for the safety of employees and the public under the specified conditions," those minimums are "not intended as a design specification or as an instruction manual." NESC, Section 1, ¶ 010. We have recognized that a violation of the minimum standards established by the NESC constitutes negligence per se. *See Gifford v. Four-County Elec. Power Ass'n*, 615 So. 2d 1166, 117 (Miss. 1992). While we have held that there is no negligence per se for a utility company which has complied with the minimum safety standards of the

8

NESC, we have said that compliance is not conclusive as to the question of due care in a particular set of circumstances. *Galloway v. Singing River Elec. Power Ass'n*, 247 Miss. 308, 152 So. 2d 710, 712 (1963).

¶23.    Here, the expert witness did testify that EMI should have known what activity may take place under the lines in the ordinary course of what goes on at a lift station. Also, he testified that EMI had a duty to make the lines as safe as possible. In making the lines safer, he listed several things that could have been done, any of which would have made the situation safer: warning orally, warning in writing, posting signs, insulating the line, putting streamers on the line, putting aircraft balls on the line, burying the cable, placing the cable in concrete, backing off from the location and running lower voltage conductors to various customers. None of those were done, and, in fact, when the lines were moved in 1986, the situation was made more dangerous, according to the expert. We find the expert's testimony adequate to prove what standard of care was required and enough to create a jury question as to whether the duty had been breached and proximately caused the injury.

¶24.    Additionally, EMI argues that there was no evidence that any breach of standard of care was a proximate cause of Hayes's death. To support this argument, EMI claims the plaintiffs did not prove EMI's wrongful conduct was the cause-in-fact of the decedent's and that the death was not foreseeable. As to the issue of cause-in-fact, it is not a stretch to see that "but-for" the lines being directly over the lift station, the metal pipe being used in the lift station's maintenance would not have come into contact with it, causing Hayes's electrocution.

¶25.    In *Mississippi Power & Light Co. v. Shepard*, 285 So. 2d 725, 734-35 (Miss. 1973), we relied on the holding in a much earlier case, *Southern Pine Electric Power Ass'n v. Denson*, 214 Miss. 397, 57 So. 2d 859, 59 So. 2d 75 (1952), which is factually similar to the present case.  In *Southern Pine Electric Power Ass'n*, the plaintiff's decedent was electrocuted while he was removing a section of well pipe 21 feet in length and a strainer five feet in length, totaling 26 feet, from his well.  The top section of the well pipe came into contact with the defendant's 7,620 volt primary transmission line strung at a height of 25 feet almost directly over the well.  57 So. 2d 859.  In affirming the verdict for the plaintiff, this Court noted:

> A fair statement of the rule as regards liability of power companies in the erection and maintenance of their wires is stated in 18 Am. Jur., Electricity, par. 53, pages 448-9, to wit: '* * * they are bound to anticipate only such combinations or circumstances and accidents and injuries therefrom as they may reasonably forecast as likely to happen, taking into account their own past experience and the experience and practice of others in similar situations, together with what is inherently probable from the condition of their appliances as they relate to the conduct of their appliances business,' . . .

*Id*. at 862.  Subsequently, this Court found that the power company should have reasonably foreseen at the time of the power line construction and placement almost directly over the well that the deceased would do work in and about his well, exposing him to danger from its lines, if the line was only 25 feet above the ground.  *Id.*  We held:

> Electricity is a highly dangerous agency, and it must be denominated negligence to erect so close to the well a high voltage line, unless insulated, or unless, in the exercise of the highest degree of care, it was [strung] high enough off of the ground reasonably to prevent injury to him.'

*Id.*  Just two years later, when a nearly identical accident came before this Court, we

10

declared:

> Appellant should have reasonably anticipated that someone working on or about the well in repairing it would likely come in contact with appellant's transmission line. *4-County Electric Power Ass'n v. Clardy*, 221 Miss. 403, 424, 73 So. 2d 144, 148 (1954).

*Id.*

¶26.     This is not the first time EMI has put lines directly over a work station, creating some possibly hazardous situation, which then resulted in electrocution.  Therefore, the lack of foreseeability argument has no merit.  Accordingly, we find there was ample evidence to support the jury's verdict that EMI was  negligent and liable.

**II.     WHETHER THE TRIAL COURT ERRED BY REALLOCATING TO EMI ALL CAUSAL FAULT ALLOCATED BY THE JURY IN THE FIRST TRIAL TO JIM AVIS AND ASSOCIATES, THE IMMUNE EMPLOYER OF THE PLAINTIFF'S DECEDENT.**

¶27.     This Court reviews questions of law de novo.  *Saliba v. Saliba*, 753 So. 2d 1095, 1098 (Miss. 2000).   The trial court incorrectly stated that *Accu-Fab v. Ladner*, had been decided by this Court one week before the trial in this case was conducted.  Actually, *Accu-Fab* was handed down almost one year after this case was tried.  Therefore, the decision in *Accu-Fab* was not controlling at the time of this trial.

¶28.     The rule from *Estate of Hunter v. Gen. Motors Corp.*, 729 So. 2d 1264, 1276 (Miss. 1999), allowed apportionment of fault to absent settling tort-feasors, "parties."  However, in *Accu-Fab*, 778 So. 2d 766, this Court ruled that the term "party" used in the *Estate of Hunter* decision did not include immune employers, so that fault could not be apportioned to an immune employer.  We reversed our *Accu-Fab* decision in *Mack Trucks II*, 841 So.

11

2d at 1115. In **_Mack Trucks II_**, we stated, ""[t]o the extent that **_Accu-Fab_** may be construed as stating that immune parties may not be assessed fault (as opposed to liability) under [Miss. Code Ann. § 85-5-7], therefore, that opinion is overruled."

¶29.   Accordingly, it was proper to allow allocation of fault to Jim Avis and Associates as an absent tortfeasor.  We find the trial court erred in reallocating fault based on **_Accu-Fab_**.

### III.   WHETHER THE TRIAL COURT ERRED BY GRANTING A NEW TRIAL ON THE SOLE ISSUE OF DAMAGES.

¶30.   The law is well settled on the issue of a trial court's ruling for a new trial.  "The grant or denial of a motion for a new trial is and always has been a matter within the sound discretion of the trial judge." **_Green v. Grant_**, 641 So. 2d 1203, 1207-08 (Miss. 1994) (citing **_Anchor Coatings, Inc. v. Marine Indus. Residential Insulation, Inc._**, 490 So. 2d 1210, 1215 (Miss. 1986)); _see also_ **_Motorola Communications & Elecs., Inc. v. Wilkerson_**, 555 So. 2d 713, 723 (Miss. 1989).  When the evidence is  viewed in the light most favorable to the non-moving party and "upon review of the entire record the trial judge is left with a firm and definite conviction that the verdict, if allowed to stand, would work a miscarriage of justice," then the trial court may award a new trial. **_Id_**.

¶31.   In its order, the trial court cited the improper allocation of fault to Jim Avis as the basis for granting a new trial on damages.  Because the court made this decision subsequent to and relying upon a decision wherein the incorrect legal standard was applied, this decision to grant a new trial on damages was also a mistake.  We find a new trial on damages should not have been granted.

**IV. WHETHER THE DAMAGES AWARDED IN THE SECOND TRIAL FOR LOSS OF LOVE, SOCIETY AND COMPANIONSHIP WERE IMPROPER AND EXCESSIVE.**

¶32. Because the trial court erred in granting a new trial on damages only, this issue is moot and need not be discussed.

**CONCLUSION**

¶33. We find that the jury verdict as to the liability of EMI is supported by the evidence. Additionally, we find that the trial court erred in reallocating fault to EMI and in granting a new trial on damages only. Therefore, we reverse the judgment against EMI in the amount of $6,854,707.02 and we render judgment reinstating and affirming the judgment against EMI in the amount of $169,175.00.

¶34. **REVERSED AND RENDERED.**

**WALLER AND COBB, P.JJ., CARLSON AND DICKINSON, JJ., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. GRAVES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**