AMERICAN CREOSOTE WORKS, INC., et al. *v.* SMITH

No. 40811 June 9, 1958 103 So. 2d 861

*Wells, Thomas & Wells,* Jackson, for appellants.

894

*Roy N. Lee,* Forest, for appellee.

Roberds, P. J.

Dovie Smith, the appellee, brought this suit in an effort to recover from the American Creosote Works, Inc.

and William H. Horne, the appellants, damages he claimed he suffered as a result of a collision between a truck-trailer, automotive vehicle, driven by Horne as the agent of the Creosote Works, and an automobile which was being driven by Smith. The jury returned a verdict for Smith and assessed the damages at $75,000. Judgment was entered accordingly, from which verdict and judgment the Creosote Works and Horne appealed to this Court.

The appellants contend: (1) That they are entitled to a peremptory instruction on the question of liability; (2) that the lower court erroneously granted to the plaintiff the instruction which is discussed hereinafter; and (3) that the verdict is so excessive as to show passion, bias and prejudice on the part of the jury. We will deal with these questions in the order stated.

 On the question of liability, there was ample evidence to justify the finding by the jury of the following facts: Smith resided near Union, Mississippi. On January 28, 1955, he was assisting in the installation of scales for the Gulf, Mobile and Ohio Railroad at Mobile, Alabama. He left his work in Mobile to drive to his home to spend the week-end with his wife and two children. He was in a Ford two-door automobile. He was traveling on U. S. Highway 15, which runs north and south. It is a paved, frequently traveled road. Some three or four miles north of Newton, he came up behind a large trailer-truck which was transporting a load of logs. The trailer-truck was traveling north, as was Smith. The trailer-truck was about forty to forty-five feet long and the logs were about sixty-five feet long. This trailer-truck was being driven by a man named McDill. Another trailer-truck was traveling north ahead of the McDill truck. They were of the same type vehicle and carrying the same type load. The front truck was being driven by Horne. Both Horne and McDill were servants of the American Creosote Works, Inc., and were on their way

to deliver the logs to the creosote works at Louisville, Mississippi. There was a Ford pickup truck being driven by Joe Walker ahead and north of the Horne truck but Smith did not know that. The Horne and McDill trucks were traveling some forty feet apart. After following the trucks for some distance, Smith decided that he would pass them. He pulled into his left lane of the road and picked up speed so as to pass the two trucks. He blew his horn and gave the proper signal. As he came along beside the front truck, which was being driven by Horne, that truck pulled into the west lane and collided with the Smith car some four feet west of the center line of the road. The Smith car turned over some four times and came to rest on the west shoulder of the highway. The accident happened between three and four o'clock in the afternoon. Smith testified that the creosote trucks were traveling some forty to forty-five miles an hour and he was traveling some fifty-five to sixty miles an hour. In other words, the jurors could have found, and evidently did find, that Smith, while endeavoring to pass the trailer-trucks, gave the proper signal and acted as a prudent man, but that Horne pulled into the left lane and struck the Smith automobile without giving any kind of warning or signal that he was leaving the right or east lane and pulling into the west lane. It is evident, without developing the facts further, that the peremptory instruction requested by the appellants was properly refused.

The court granted to the plaintiff the following instruction: "The Court instructs the jury for the plaintiff, Dovie Smith, that, if you believe from a preponderance of the evidence in this case that on January 28, 1955, the said plaintiff was driving a Ford automobile in a northerly direction on Mississippi Highway No. 15 approximately four miles north of the Town of Newton, Mississippi, and that he carefully and reasonably drove into the west lane of said highway and was carefully and reasonably attempting to pass and was carefully and rea-

sonably passing a truck loaded with poles, driven by William H. Horne, and, if you further believe from a preponderance of the evidence that the said William H. Horne negligently drove the said truck west of the center line of said highway and into the path of plaintiff's automobile, and that such negligence, if any, proximately caused or contributed to injuries, if any, of plaintiff, then you must return a verdict for the plaintiff against the defendants, American Creosote Company, Inc., and William H. Horne.''

■■ Appellants say this instruction was so vague and indefinite, and in such general terms, as to constitute no guide to the jurors in reaching their verdict, citing and relying upon Meridian City Lines, Inc., et al. v. Baker, 205 Miss. 58, 19 So. 2d 541. The instruction under consideration is entirely different from that condemned in the cited case. The instruction quoted above, of which complaint is made, specifically told the jurors that before they could return a verdict for the plaintiff they must believe from a preponderance of the evidence that Smith carefully and reasonably drove into the west lane of the highway, and was carefully and reasonably attempting to pass the truck ahead of him, and that as to Horne that he negligently drove the truck west of the center line of the highway and into the path of Smith's automobile, and that such negligence was the proximate or a contributing cause of the injuries. The instruction was sufficiently specific and definite to constitute a proper guide to the jurors in the performance of their duties. In addition to this, the appellants obtained instruction No. 4, which set out in detail all of the duties and legal requirements which the law imposed upon the plaintiff in the operation of his automobile, and stated that if the jurors believed that the plaintiff violated or failed to comply with the specified requirements and that such violation or failure was the sole, proximate cause of the accident, the jurors return a verdict for the defendants.

All of the instructions must be read and considered together. So, considering the instructions which we have specifically mentioned, as well as others obtained by the parties and which we have not dealth with specifically, we think the jurors were adequately and properly instructed as to their duties and responsibilities.

We come now to the amount of the verdict,—$75,000.00. Appellants say the amount of the verdict is so out of proportion to the injuries as to show passion, prejudice or bias on the part of the jury. We will endeavor to detail the injuries briefly and accurately.

Smith testified that his left leg was pinned under his Ford car after the wreck; that he suffered a broken left hip, a broken right foot, a broken rib and lacerations on his face. He was carried to the hospital at Union, Mississippi. Dr. Earl Laird, connected with the Union Hospital, treated Smith on his arrival. He testified that Smith had a fractured left leg, and a fracture of two bones in his right foot; that Smith was in considerable pain. He examined Smith the morning of the day he was testifying. The trial was had August 23, 1957. In his judgment Smith had a fifteen-degree flexion in his left knee. He summed up his conclusion in these words: "He will always have permanent stiffness of his left knee since it has been this long and does not have any more flexion than he does have, it will never be as mobile as it once was." Smith remained at the Union Hospital three days, when he was carried to the Rush Memorial Hospital at Meridian. Dr. Leslie Rush testified that Smith was brought to his hospital January 28, 1955; and that "He was admitted to the hospital because of a fracture of the left thigh bone. He had a comminuted fracture at the junction of the upper and middle third, and he had a fracture of the bone in the foot — first metartarsal bone, just behind the big toe on the opposite foot. * * * comminuted means broken in more than one place." He placed the foot in "plaster just to keep it still. His

thigh was operated on and I put an intramedullary pin or rod down the bone to hold it in position.'' Smith was in the Rush Memorial Hospital at that time twenty-two days.

Smith then went to the home of his father-in-law. He was in bed about seven weeks. Ten months after the first trip to the Rush Memorial Hospital, Smith returned to that hospital. The cast was removed from his right foot. Dr. Rush performed a bone graft operation on his hip and substituted another pin in his hip. He was in the hospital at that time for twenty-one days. At the time of the trial, some two years and seven months after date of his injury, his left leg was smaller than the right from lack of use, and he walked with a crutch. Mr. and Mrs. Smith both testified that he had suffered much pain.

As to what his future condition may be, Dr. L. W. Willey, who lives at Forest, Mississippi, examined Smith just before the case was tried in August, 1957. He said the left leg was not as large as the right leg due to non-use. There was some swelling in the left ankle. He had a fifteen-degree flexion in his left knee. At the time of the trial Smith was not able to walk on his left leg ''because of the unhealed injury in the upper third of the femur on the left.'' Smith yet had the steel pin in the bone of his left leg. The pin is put in to prevent movement at the point of the fracture. Dr. Willey concluded his testimony by this statement: ''I am of the opinion that he will always have some disability.'' He said his knee would improve. Smith himself testified that at the time of the trial he could bend one knee forty-five degrees and the other ninety degrees.

It should be here stated that Mr. Smith, several years before his present injury, had suffered a fracture of his left knee, but it appears he had gotten over the former injury, and, before the present injury, was able to do satisfactory manual labor at his job with the railroad, as above-stated.

Dr. Rush was a valuable witness as to the extent, nature, and duration of Mr. Smith's injuries. He was asked if Smith had suffered pain and replied: "That is a little bit hard question to answer. Of course a broken thigh is a right painful condition, and an operation on a broken thigh is painful, and trying to exercise a stiff knee, of course, is painful." He said Smith could possibly walk but he, the doctor, had not permitted it "Because I am afraid he might break the bone graft. It isn't solid enough yet." The leg would be easy to break again "At this stage." He said the left knee had a thirty-degree movement at that time. He was asked as to the permanency of the knee condition, and said: "It appears that this is permanent, but I hope it will improve some." He said "I don't believe he will get full range of motion even if it was operated on * * *" The doctor was asked his opinion as to the permanency of the thigh injury. He replied: "I can't form a definite 'yes' and 'no' opinion for this reason. The man developed a non-union when I didn't expect it, in the first place. He had had a non-union when his X-rays didn't show it, in the first place. Now, I can't be 100% positive that I am getting a true picture from this X-ray. I believe that we are. He has less pain when he bears weight on his leg. Now, that's encouraging. His leg seems solid, of course, we've got this large rod in there which helps keep them from rocking. These X-rays indicate these bone grafts are growing together, but those little dark areas in there suggest that a lot of this is still cartilage. Now, cartilage, of course, is not solid bone and in the healing of a fracture, nature first begins to put down cartilage and bone, and the cartilage is gradually transformed into hard bone. Now, this operation, I believe, was done a year and a half ago — this last one — that has been 18 months, and its still not completely solid. Now, I feel encouraged that he probably will get a good union, but I cannot be certain of it. He shows evidence of healing, but it is a very slow thing."

On cross-examination, Dr. Rush said Smith had told him he formerly had suffered a "fracture" of the knee cap, and the doctor could not say whether the present knee condition had a connection with the former injury. He said that on July 17 he had instructed Smith to use only one crutch, thereby increasing the weight on the left leg. The following questions and answers closed his testimony as to the extent of the thigh injury: "In other words, I believe you say you feel he probably will get a good union in his left thigh, is that correct; I don't quite know. His healing, I mean, it is encouraging that those fragments, these bone fragments I put in there are growing together. It is occurring much slower than usually happens, in the first place. The progress now for 18 monhs has been a slow healing, but it is progressing. Now, whether or not this will continue and finally get solid where it will stay like it is, or whether it will fracture, and produce a non-union, I just don't know. Did — you did say on direct examination that you felt probably he would get a good union, is that correct? Didn't you testify to that? I may have said it that way. It is hard for me to be definite. You are not able to guarantee it? It would be probable and possible — with a little bit of play on words to me, because I can't be that sure. I feel encouraged and I hope it will keep going like it does. If it does, he probably or possibly will get a good union."

The logical conclusion from the testimony is that the broken foot was about healed, and, while, of course, it will never be as good as if the injury to it had not occurred, there is no proof the injured condition will hamper his activities, and impair his powers to earn a livelihood, to any great extent in the future. His knee condition is expected to improve as he is able to use his left leg. He will likely have a good union in the left thigh. He will, of. course, be hampered by that thigh in his physical activities, but it is evident there will be many

activities and avocations open to him whereby he can earn wholly, or to a large extent, a living for himself and family.

Smith has a wife and two children. The children, at the time of the trial, were nine and two years of age respectively. He was forty-two years of age. He was earning $62 per week. He had received bills for medical and hospital expenses in the amount of $1,512.28. He has a life expectancy of 27.62 years.

Fixing a fair and just amount of damage for personal injuries is always a troublesome question. In its very nature there is no precise standard by which the question can be measured and tested. A number of factors enter into it. Ordinarily it is a question for the jury. However, under our judicial system, there necessarily must be some regulation by the appellate court of the amount — the excess in the one case and the insufficiency in the other.

In only three cases in this Court have we dealth with verdicts as large as the one in the case at bar. Sandifer Oil Co., Inc. v. Dew, et al., 220 Miss. 609, 71 So. 2d 752; 4-County Electric Power Association v. Clardy, 221 Miss. 403, 73 So. 2d 144, and City of Jackson v. Roy Henry Reed, Minor, By his Mother and Next Friend, Mrs. Henrietta Reed, No. 40,764, decided May 26, 1958. But the facts of the foregoing cases are very different from the facts of the case at bar. In the Sandifer case the verdict was for $85,000, the largest ever rendered in this State. In that case a fourteen year old girl suffered a horrible death from burning gasoline negligently set out by defendant. The negligence was so gross that the jury was permitted to find defendant guilty of punitive damages as a deterrent to others to be guilty of like acts.

In the 4-County Electric Power Association case the verdict was for $75,000, the same as in the case at bar. But in that case plaintiff had a life expectancy of forty-one years, and defendant was engaged in the use of the

dangerous agency of electricity, and plaintiff's injuries were much more painful and serious than those of appellee. In fact, the injuries were so great that this Court said: "In brief, appellee is totally and permanently disabled."

In the City of Jackson case the verdict was also $85,000. Plaintiff was sixteen years of age. He was a normal, healthy boy. As a result of the accident, his mentality will always be that of a child from four to six years of age. In other words, it appeared that for the rest of his life he would have the mentality of a small child.

The next largest verdict in Mississippi was that of $37,000 in the case of Southern Beverage Co., Inc. v. Barbarin, 219 Miss. 493, 69 So. 2d 395. Because of the great discrepancy between that verdict and the verdict in the case at bar, we deem it not helpful to discuss and distinguish the Barbarin case on the facts.

In the case at bar, the foot, while it may never be entirely well, apparently there will be a slight disability in the use of it; the knee, stiff from lack of use of the left leg, will gradually, it seems from the testimony, regain its usefulness, and the thigh, or left leg, at most, will be only partially incapacitated. The injuries of appellee are much less severe and permanent than those in the cases where comparable verdicts have been rendered.

 Some of the concurring Judges think the judgment should be reduced to fifty thousand dollars. However, all of these Judges think it should not be permitted to stand in a greater sum than sixty thousand dollars. Consequently, if appellee will enter a remittitur of fifteen thousand dollars within thirty days, the judgment of the lower court will be affirmed; otherwise, the case will be reversed and remanded for assessment of damages only.

Affirmed with remittitur.

*McGehee, C. J.,* and *Kyle, Ethridge,* and *Gillespie, JJ.,* concur. *Lee, J.* took no part.

HALL, J., dissenting:

With deference I respectfully dissent from that part of the controlling opinion in this case which orders a remittitur of $15,000 from the verdict of the jury, and I think that in so doing a majority of the Court have entirely ignored what has been the law in this State for more than 100 years. The opinion contains a fairly accurate statement of the facts, but the conclusions reached from the testimony, in my opinion, are entirely unjustified.

After stating that Dr. Rush, who is admittedly an outstanding bone surgeon, testified that he couldn't guarantee anything as to the appellee's recovery, notwithstanding the fact that a period of about two and a half years had transpired since the injury, Dr. Rush testified, as stated in the controlling opinion, on cross-examination: "It would be probable and possible—with a little bit of play on words to me, because I can't be that sure. I feel encouraged and I hope it will keep going like it does. If it does, he probably or possibly will get a good union." The controlling opinion then proceeds to state that the appellee "will likely have a good union in the left thigh. He will, of course, be hampered by that thigh in his physical activities but it is evident there will be many activities and avocations open to him whereby he can earn wholly, or to a large extent, a living for himself and family." I insist that the conclusion of the writer of the opinion is wholly unjustified and is not supported by the evidence.

The appellee had a fracture of the thigh, which Dr. Rush described as a "butterfly" fracture, and in fact the thigh was practically shattered, so much so that Dr. Rush considered that a bone graft was necessary in order to hold these fractured pieces together, but at the time of the trial the bone graft had not been successful and the most he could say was that he had hopes that there would be union in the thigh after this second operation where he had bored a hole into the bone and had driven

a long rod about the size of a pencil down into the marrow of the bone. The first time he did this he thought that the bone was uniting, but after months of waiting he finally discovered that there was no union of the bone and he performed the second operation, boring another hole and driving with a mallet a larger rod down into the marrow of the bone, which rod the appellee still carries with him. Consequently the statement that the appellee will likely have a good union in the left thigh eventually is not supported by the testimony of Dr. Rush. He merely hoped that there would be union after this second operation, but it has not developed yet.

The record is barren of any proof that there will be many or any activities and avocations open to the appellee, whereby he can earn wholly or to a large extent, a living for himself and family. The appellee is an uneducated man and was employed as a railroad bridge carpenter. That is the only work that he knows and it is certain that he will never again be able to climb ladders or do anything in connection with railroad bridge work. So far as that work is concerned he is finished for life. Of course if he were an educated man, he might eventually be able to get on crutches and do something that requires only mental effort, but unfortunately for the appellee he does not possess that qualification.

In the early case of Steppacher v. Reneau, 25 Miss. 114, 119, more than one hundred years ago, this Court laid down this rule: "The verdict, according to well established principles, was certainly supported by the testimony. It is true, that under the circumstances of the case, a verdict for a smaller sum would have been more in accordance with the principles of justice. But this was a question for the jury to decide, and as they violated no rule of law in assessing the plaintiff's damages, the verdict must be sustained."

The Court there committed itself to the proposition that while under the circumstances of the case a verdict for a smaller sum would have been more in accordance

with the principles of justice, nevertheless this was purely a question for the jury to decide. In this case the jury has decided the question. In a long line of cases extending down to the present time this Court has repeatedly held to the same effect.

In the case of McDonald v. Moore, 159 Miss. 326, 332, 131 So. 824, this Court said: ''As to the amount of the verdict, it appears to be rather small for the injury, but compensation for injuries on the facts shown in this record is peculiarly one for the jury's judgment, and unless the jury is warped by passion or prejudice and we can so see from the record, we cannot control their judgment upon this proposition. Juries are better calculated to know the extent of the injuries and the amount of damages than the appellate court. Their verdict here was sanctioned by the judgment of the trial judge, which is also entitled to weight and respect. We therefore find no error suffered by the appellant sufficient to warrant the reversal of her cause.''

In the case of J. C. Penney Co. v. Evans, 172 Miss. 900, 907, 160 So. 779, this Court said: ''Complaints that verdicts are excessive are being made with such increasing frequency in appeals from judgments in actions for damages, that it may be well for us to again state the rule to which the court must conform in responding thereto. In actions for damages of the character of the one here, the only legal measure thereof which the law knows, is the sound discretion of the jury, and the court will not substitute its judgment for that of the jury, unless the damages awarded are so great, when viewed in the light of the injury sustained, as to clearly indicate that, in awarding them, the jury was controlled by passion, prejudice, or corruption. New Orleans, etc. R. R. Co. v. Hurst, 36 Miss. 660, 74 Am. Dec. 785; Memphis & C. R. Co. v. Whitfield, 44 Miss. 466, 7 Am. Rep. 699; Chapman v. Powers, 150 Miss. 687, 116 So. 609; and many others to the same effect. The evidence here does not bring this case within that rule.''

And we again state that this Court will not substitute its judgment for that of the jury, unless the damages awarded are so great, when viewed in the light of the injury sustained, as to clearly indicate that the jury was controlled by passion, prejudice or corruption. And in other cases, this Court has said that it will not interfere with the amount awarded by a jury unless the same is so large as to shock the conscience.

In next to the last paragraph of the controlling opinion it is stated that the use of the appellee's left leg will gradually, it seems from the testimony, regain its usefulness, and the thigh, or left leg, at most, will be only partially incapacitated. I do not agree with those conclusions. They are not supported by any testimony in the record. In fact, while the appellee was using crutches at the time of the trial, Dr. Rush stated that he had given positive instructions for appellee not to bear any weight on the leg, and it seems to me that a fair conclusion from the whole record is that the appellee is totally disabled for life. For awards in other states, it is quite common to find judgments from $100,000 to $200,000, and there have been judgments in some cases on up to a half million dollars and more in some of the northern states, and an award of $75,000 in this case does not shock my conscience nor satisfy me that the jury was biased or corrupt. For a review of a number of the Mississippi authorities on the question which I have been discussing, see my dissenting opinion in the case of Kincade and Lofton v. Stephens, 50 So. 2d 587, 589, et seq., not reported in the State Reports.

*Holmes and Arrington, JJ.,* join in this dissent.