BUFORD et al. *v.* O'NEAL

No. 41775          April 10, 1961          128 So. 2d 553

884

*Carlton & Henderson,* Sumner; *Brewer, Brewer & Luckett,* Clarksdale, for appellants.

*Breland & Whitten,* Sumner, for appellee.

GILLESPIE, J.

Appellee, plaintiff below, sued his employers for damages sustained when he was injured in dismantling a large diesel engine in the gin of appellants. There were four charges of negligence: (1) Failure to furnish appellee and his co-workers an experienced man in the work they were doing, (2) failure to furnish a reasonably safe place to work, (3) failure to furnish appellee reasonably safe means, ways, and appliances to do the work, and (4) failure to use reasonable care to furnish appellee a reasonably sufficient number of helpers to dismantle and remove the diesel engine.

The case was tried and the jury returned a verdict for $55,000. Judgment was entered accordingly and appellants appealed to this Court, raising only two questions: (a) Whether appellants were entitled to a directed verdict, and (b) that the verdict was excessive.

Since the jury resolved all conflicts in favor of appellee, we state the facts in the light most favorable to him. This means that appellee is entitled to have this Court consider as true all evidence in his favor, together with all reasonable inferences which could be drawn therefrom; and it means that we must disregard all testimony favorable to appellants whenever such evidence is contradicted by that for appellee. All this is in full accord with the many cases of this Court so hold-

ing. Having said this, we dispose of a considerable part of appellants' argument which is premised on testimony which the jury rejected.

Appellants were the operators of a large plantation on which they operated a cotton gin. This plantation was superintended by Seward Mills, one of appellants. Appellee had been working for appellants for some years as gin manager from August 1 to December 31 of each year. The agreement for appellee to perform the same services for the 1959 ginning season had been made the previous December. A few days before August 3, 1959, Mills talked to appellee and told him to begin work on August 3, and at that time a discussion was had between them regarding the dismantling of the diesel engine so that it could be replaced with an electric motor. Appellee started on August 3 with the help of three helpers cleaning the cotton gin and that afternoon Mills came to the gin and told appellee to start taking the diesel engine out the next morning, and that it was to be taken to Clarksdale and sold for junk. The previous Saturday, appellee had secured his helpers from Mr. Bloodworth, the plantation manager who had charge of all labor on the plantation and from whom appellee would get his labor. At that time appellee told Bloodworth that he needed a gin crew starting Monday morning, and Bloodworth told him he could not spare a gin crew but could only let him have one man. When he started Monday morning, August 3, there was available to appellee a white man and two Negroes, who were a part of the regular gin crew. On Tuesday morning, appellee and the others started tearing out the diesel engine and appellee again saw Bloodworth and got permission to hire another Negro helper. Appellee told Bloodworth that he was going to need more help the next day, which would be Wednesday. Bloodworth replied that he had them all busy and he might get some more help later on. Appellee saw Bloodworth on Wednesday morning at the gin

and told him he was running into heavier work every day and he did not believe he would be able to carry on with the men he had—at that time he had one white man and three Negroes—and Bloodworth replied that he could not get any more help at that time but he might later get more help. Bloodworth came by the gin again Thursday morning just after appellee and the other employees had lifted the fly wheel out of the pit, and appellee told Bloodworth he needed more help to get the fly wheel on the truck. Bloodworth made no reply, but shook his head and left. Appellee was injured a short time later as hereafter related.

The diesel engine which was to be dismantled and removed was located on the south side of the engine room of the gin. The fly wheel was in a concrete pit in the southeast corner of the engine room. The engine room was 25 feet east and west by 24 feet north and south. The door where the truck was placed to remove the parts of the engine was on the east side of the room near the south wall. Because of a burner and two concrete bearing foundations, the fly wheel could not be moved directly from the fly wheel pit to the door where the truck was, but had to be rolled around the room as hereafter related.

When appellee and the helpers started dismantling the gin, no one present had had any experience in dismantling or removing heavy machinery of that type. They took the engine apart as far as they could and used a sledge hammer to break up the parts which they placed on a cart, then rolled the cart to the truck at the door on the east side of the engine room for loading. Part of the engine had been thus loaded and trucked to Clarksdale for sale as scrap iron. When they tried to break up the fly wheel, they were unable to do so. They had available one hoist of about one and a half ton capacity and one small hoist of a ton capacity. The beams above the fly wheel were too high for the hoists to be used, so

they were put together and the wheel was hoisted out of the pit and balanced on the floor, standing on its rim. The wheel was 5 feet 7 inches high with an eleven-inch rim that was slightly bevelled or rounded so that it was difficult to roll the wheel without danger of it turning over, or falling. The wheel weighed about 3,000 pounds. After the wheel was hoisted out of the pit, there was no way to use the hoists further in moving the wheel to the truck because there were no overhead beams on the side where the truck was. After appellee talked to Bloodworth the last time as above related, the wheel at that time being held in balance near the pit, a path was carefully swept from the wheel's position toward the west wall, thence along the north side of the engine room, thence to a place behind the truck bed. The purpose of this was to remove any objects that would unbalance the wheel, since it would not be possible for the men to hold it if it tilted. The truck was standing on the ground, which was lower than the concrete floor of the engine room, and the rear of the truck bed extended slightly into the door so that the bed of the truck was about 18 inches above the floor of the engine room. The wheel was balanced just to the rear of the truck and about 18 inches distant. About twenty inches west of the wheel was located the bearing foundation already mentioned. This foundation was of concrete and measured 14 inches high, 24 inches north and south by 12 inches east and west. Thus the wheel was almost equidistant between the truck bed and the concrete bearing foundation. Appellee decided the best way to get the wheel loaded was to push it against the truck bed and let it rest there until the men could climb the ladder and remove the chain hoists from over the fly wheel pit, then attach the hoist to the front of the truck and pull the wheel onto the truck. Appellee testified that they had to do something with it, that it was too dangerous to leave standing there, so they pushed it against the truck in that man-

ner to keep it from falling on them. It will be recalled the rim was slightly rounded and it would easily turn; if it started to fall it could not have been held by the number of men available. When the wheel was thus pushed toward the truck it came to momentary rest against the truck, and appellee looked away to see about the men getting the chain hoist down. As appellee looked away, the wheel slipped and the bottom part pushed against the bearing foundation. Appellee's foot was caught between the wheel and the foundation.

Appellee testified that he did not fully realize the danger of handling the fly wheel with the men he had until it was hoisted out of the pit and they started rolling it around to the truck, and that when they rolled it to the truck something had to be done with it; that they then pushed it over on the truck to keep it from falling on them.

A qualified expert of wide experience in dismantling this type of engine testified that it would require ten or twelve men to safely dismantle and remove the diesel engine; that the proper method would have been to place a beam over the engine room on the side where it was to be loaded and use two chain hoists of one and a half capacity to move the wheel to the truck, thence hoist it onto the truck with one of the hoists. The overhead beam facilities were not available in the engine room. It was also shown that there was not available two chain hoists of the size just mentioned. Appellee testified that if he had told Mills that he could not do the job without more men or if he had refused to continue with the help he had, he would have been fired.

Mills was not present when the engine was being dismantled.

■■ ■ On the question of liability, the sole question raised on this appeal is whether the lower court erred in overruling appellants' motion for a directed verdict. They contend that there was no evidence to support a

verdict. The only instruction requested by appellee on negligence, and which the court gave, was based on the charge that appellants were negligent in failing to use reasonable care to furnish appellee a reasonably sufficient number of helpers to dismantle and remove the diesel engine.

The general rule is that in the case of employment requiring numbers of workers to act in concert, it is the duty of the employer to provide a sufficient force to enable his employee to accomplish the work assigned to them with reasonable safety to themselves, and, if an injury results to an employee by reason of insufficiency in the number of his co-workers, he is entitled to maintain an action against the employer. This rule is merely an extension of the fundamental doctrine requiring the employer to provide his employees with safe instrumentalities and a safe place to work. In order for the employee to recover, it must appear that the employer did not use reasonable care and prudence in furnishing the number of employees actually necessary for doing the work safely. 35 Am. Jur., Master and Servant, Section 197, p. 626; Jefferson v. Denkman Lbr. Co., 167 Miss. 246, 148 So. 237. Appellant does not dispute the rule just stated but argues that it does not apply for several reasons.

Appellant contends that when appellee was told he could not have any more help right then that appellee chose to go ahead on his own and was injured because of his own foolishness, and that he assumed the risk to which he was exposed. We do not think there is any merit to this contention. The jury was justified in finding that when appellee and his co-workers used the chain hoist to remove the fly wheel from the pit and stood it on the rim, that appellee could not then abandon the job without allowing the fly wheel to fall; that something had to be done with it and that reasonable prudence under all the circumstances required that he roll it to

the truck bed and thus continue the work. The jury was also justified in finding that appellee was reasonably justified in believing that his job would be imperiled at any time he abandoned the work or refused to go ahead without more employees.

In our opinion, it was a jury question as to whether or not appellee assumed the risk. Pearl River Valley R. R. Co. v. Moody, 178 Miss. 1, 171 So. 769; Goodyear Yellow Pine Co. v. Mitchell, 168 Miss. 152, 149 So. 792; Gow Company v. Hunter, 175 Miss. 896, 168 So. 264; Jefferson v. Denkman Lumber Company, supra; Hardaway Contracting Co. v. Rivers, 181 Miss. 727, 180 So. 800; Central Lumber Company v. Porter, 139 Miss. 66, 103 So. 506.

Appellants also contend that the failure to furnish a sufficient number of employees was not the proximate cause of the injury because any number of employees would not have prevented the particular injury sustained by appellee. In their brief, appellants concede that if the accident had happened while the wheel was being rolled around to the truck, the verdict should not be disturbed by this Court. They argue that since the accident happened after the wheel had reached the truck bed the only cause of the accident was the fact that the appellee had his foot where it should not have been, and the careless manner in which appellee and his co-workers pushed the fly wheel against the truck. The testimony in this case fully justified the jury in finding that the dangers involved in rolling the fly wheel from the pit to the truck—that is to say, its tendency to fall because of the rounded face of the rim and the insufficient number of men to hold it if it started to fall—still existed when the wheel was standing on the rim at the rear of the truck, and that the reason appellee and his co-workers pushed the wheel against the truck was an effort to get it at rest where it would not fall over and injure someone.

We have considered all of the contentions made by appellants and are of the opinion that the question of negligence was one for the jury.

The next and only remaining assignment of error is the contention that the verdict of $55,000 was excessive to the extent that it shows prejudice and bias on the part of the jury. Appellants frankly concede that they have found no Mississippi case in point. The case of American Creosote Works, Inc. v. Smith, 233 Miss. 892, 103 So. 2d 861, would not justify us in disturbing the verdict in this case. In the cited case the injuries were not shown to be as serious as they were in the present case. Appellee was taken to the hospital at Sumner and his foot cleaned and bandaged and then sent directly by ambulance to Campbell's Clinic in Memphis. X-rays revealed that the major bones in the foot received multiple fractures and there was very little blood getting the the foot. After a cast had been put on the foot reaching to the thigh, appellee developed gangrene, and eventually his leg had to be taken off about six inches below the knee. He also had two other operations resulting from the injury, one of which was so serious that appellee was expected to die. His colon swelled, perforated and emptied into the peritoneal cavity and peritonitis developed, requiring major surgery. He also developed a clot on his lungs. At the time of the trial, appellant spent most of his time in a wheel chair but was able to move about on crutches to a limited extent. He was 59 years of age, with a life expectancy of 16.2 years, and his earnings were about $300 per month. The medical expenses in this case ran somewhere between $7,000 and $9,000. Appellee suffered greatly over a long period of time. We would not be justified in finding that the verdict was so excessive as to evidence passion, prejudice and bias on the part of the jury.

For the reasons stated, the judgment of the lower court is affirmed.

Affirmed.

*Lee, P.J.,* and *McElroy, Rodgers* and *Jones, JJ.,* concur.