RUNNELS *v.* DIXIE DRIVE-IT-YOURSELF SYSTEM
JACKSON CO., INC.

April 12, 1954

No. 39137          60 Adv. S. 7          71 So. 2d 453

*Collins & Collins, R. C. Brown,* Laurel; *Barnett, Jones & Montgomery,* Jackson, for appellant.

*Welch, Gibbes & Butts,* Laurel; *Snow & Covington,* Meridian, for appellee.

684

Roberds, P. J.

Appellee is in the drive-it-yourself automobile leasing business in Jackson, Mississippi. Hereafter we will call it The Drive-It. Runnels claims that on the morning of

January 14 he rented a car from The Drive-It. He signed a receipt "Phillip Werlein by Roy Runnels." Werlein was his employer. Near midnight January 15 Runnels, while driving the car and alone therein, had a wreck and suffered severe and serious personal injuries, for which he brought this action. He asserted the personal injuries resulted from defect in the automobile.

The Drive-It defended on the grounds, (1) the Jones County Circuit Court had no jurisdiction, (2) that it had no contract with Runnels, (3) that Runnels accepted the car as being free of defects, (4) that, as a matter of fact, it was not defective and the injuries did not result from defects but from Runnels' own negligence, and (5) that Runnels assumed the risk of such defects, if any, as existed in the automobile.

When plaintiff rested his case the trial judge, on motion of defendant, excluded the evidence and directed that verdict be returned and judgment entered for the defendant, which was done, from which action this appeal was taken.

We do not find an oral opinion of the trial judge in the record but it is stated in the briefs that the main reason for his action was his conclusion that Runnels, under the facts of this case, assumed the risk of operating this automobile. We also confine our discussion and decision to that question.

This is the testimony bearing upon it. Plaintiff testified he was 29 years old at the time of the trial; was married and had four children—all boys. He lived in Jackson, Mississippi. He was a piano tuner by profession and had been employed by Phillip Werlein, Ltd., of Jackson for two and a half years in that work. His average wage was $125.00 per week.

On the morning of January 14, 1952, around 9:30, he went to the place of business of The Drive-It on Lamar Street in Jackson. His younger brother, Billy, was with him. He rented a 1951 Plymouth car from The Drive-It. He and his brother started to D'Lo, some 28 miles south-

east of Jackson. He noticed the car was "shimmying," especially when the speed got to around 45 miles per hour. He said it did that some 7 or 8 times on the way to D'Lo. He and his brother worked on a piano at D'Lo, and about 9 o'clock that night started back to Jackson. The car continued to shimmy on the way back to Jackson. They spent the night in their respective homes in Jackson. Neither brother made any effort to contact the Drive-It or any agent thereof, either to have the defect in the Plymouth corrected or to get another car. In other words, no notice whatever was given the Drive-It of any defect in the rented car. Plaintiff and his brother left Jackson the next morning, January 15, to go back to D'Lo. Plaintiff said the action of the car was about the same as the day before. They finished work at D'Lo and plaintiff decided to go to Laurel, some 85 to 90 miles from Jackson. Billy got out at Mize to visit his mother who lived there and plaintiff went on to Laurel. Plaintiff was to pick up Billy as he came back through Mize.

Billy Runnels' testimony paints the picture to this point a slightly different color. He was 18 years old, married, lived in Jackson, was a brother of plaintiff and had been working for plaintiff for 6 months. He was with plaintiff when the rental arrangement was made and went with him to D'Lo and back to Jackson on the 14th and from Jackson to Mize on the 15th. He said the car shimmied at all speeds beginning at 10 miles an hour. He said, "It shimmied some at all speeds, but if you got over forty-five you could hardly hold it in the road. Q. And it shimmied at all speeds? A. Yes, sir. Q. How fast did your brother drive? A. He was driving about fifty-five. Q. It shimmied worse at fifty-five than at below fifty-five as I understand? A. Yes, sir. Q. Did he drive at a steady clip of about fifty-five? A. That's about right." He said they stopped at service stations but did not have a mechanic examine the car to ascertain the trouble. After getting out at Mize he did not see his brother again until after the wreck. In describing his

brother's condition at the time of the trial he said, "I don't think he can remember much now."

Plaintiff left Laurel about 11 o'clock at night to return to Jackson. He was alone. In going to Laurel he traveled Highway 49 from Jackson to Magee and Highway 20 from Magee to Laurel. He was returning over the same highways. There was a heavy fog, especially in the low places.

The residence of Mr. J. B. Murray is about 75 yards west of Highway 20 and approximately 7 or 8 miles northwest of Laurel. Between twelve and one o'clock Mr. Murray was awakened by a loud crash in the highway in front of his home. He quickly went to the scene. He found the Plymouth car lying bottom side up crosswise the highway. It was about 100 feet north, or northwest of his driveway. The car had skidded on the black top some 15 feet and had run into an embankment on the east side of the road and finally came to rest bottom side up across the highway. No one was in it. The skidmarks began just beyond the top of a small hill where there was a decline and the road began to curve to the left. The car appears to have skidded several feet on its top. There was a heavy fog and the black top was wet from the fog. Murray found plaintiff lying partly in his driveway and partly in the culvert, and, as we understand the facts, the car was around a hundred feet north of this driveway. Plaintiff was unconscious. Witness and his brother rushed the plaintiff to a hospital.

Plaintiff undertook to tell how the accident happened. He said, "Well, as you know, first there was a little curve there, I just turned the curve and turned the wheels around, but they went further than I cut them, and as I tried to straighten up, instead of straightening up, they just cut all around and wheeled to my right," and he ran into an embankment. He said the last thing he remembered was a flash of light in his face. He testified he had been driving automobiles for many years. He had driven various makes of cars. He had driven several

when they were shimmying. He was asked "And when they shimmied did you have anything done about them when they belonged to you?" And he replied, "Well, sure I did, when one shimmied with me I would go get it fixed." He then related this experience: "Well, I had one that shimmied, a Chevrolet pickup, I was coming to Laurel and I was going around a curve, just about like the curve where I had this accident, and one of the rods came aloose on the left side of the car and I went across the left side of the road and ran into a woman's yard, through her flowers and onto her steps and stopped. Anyway, I got that fixed." He added that "the Chevrolet pickup acted like this car, it shimmied, but the front end moved too." He was asked why he didn't have a mechanic examine the Plymouth and replied: "I figured it would be safe." He said he knew The Drive-It people stayed open all the time but he did not contact them because he "figured" they would furnish him a safe car.

William Dewey Kennedy lives at Mize. He came upon the scene about 11:30, a few moments after the accident. The car was across the road bottom side up, and "the steering rods had dropped down." He did not know whether the dropped rods caused the wreck or the wreck caused the rods to drop. He said, "Just as you go over the hill you enter a curve going to the left." It is a "stiff curve there." "The skid marks started where the curve began." He said the car "skidded a pretty good piece," not quite 200 feet. However, he said it skidded on the top—when the car was bottom side up—about 50 feet. He said the car hit the Murray driveway culvert. "Q. And then it showed skid marks all the way down that highway where the top of that car had skidded along the surface of the highway down to the point where it stopped? A. Yes, sir."

Rollin Mauldin lives in Laurel. He aligns automobile wheels. He explained the difference in the effect of wheels being out of line and shimmying. In the first case the car "weaves and wanders," shimmying is a side

motion of the front wheels. The driver feels the shimmy in the steering wheel. It indicates a faulty steering and maybe a faulty connecting rod. He said it is dangerous to drive a shimmying car. He thought the "front end" of a car should be inspected each two or three months, or when the car has run two or three thousand miles. However, he also said a shimmy condition might develop suddenly and without warning.

W. R. Lyons was manager of the Jackson Branch of Werlein. He visited and talked with plaintiff at the hospital after he became conscious. He said "And I asked him and he told me he had no idea in the world what could have happened, that his mind was just blank concerning what happened, anything could have happened to him, he did not know."

There was some other testimony, mainly as to the extent of the injuries, but the foregoing is the substantial evidence bearing upon the question of assumption of risk.

■■ ■ The doctrine of assumption of risk has been abolished in Mississippi only as between master and servant in certain cases. Section 1456, Mississippi Code 1942. The relation here was that of bailor and bailee, assuming that the contract for hire of the automobile was made between Runnels and Drive-It and not between Drive-It and Werlein. "Under the doctrine, '*Volenti non fit injuria* (that to which a person assents is not esteemed in law an injury), a person who (voluntarily) assumes the risk incidental to the use of a particular hired car, or in the manner of its use, may not recover'." Blashfield Enc. Automobile Law, Vol. 4, Pt. 1, Section 2256, page 294.

"Furthermore, the bailor is not responsible for damages resulting through the use of the article after the bailee had discovered its unsuitability for use, and the bailee cannot continue to use the article and then after the bailment is over claim damages for breach of the warranty without having given the bailor the opportunity to make good on such warranty." 8 C. J. S., pg. 260, Sec. 25.

In Saxton, et al. v. Rose, et al., 201 Miss. 814, 29 So. 2d 646, Judge Smith assumed two states of facts under which Saxton, the plaintiff, had knowledge of the defective condition of the motor—in one Eldridge had told him of the defect, in the other Saxton knew of the defect from other sources—and in neither of which could Saxton recover, the court saying ". . . we will suppose that none would dispute that Saxton had assumed the risk for an injury arising out of the defective condition." The rule appears to be general and firmly established that where a bailee plaintiff voluntarily continues to use a defective machine after knowledge of the defect, he cannot recover for injuries resulting from such defect. Robirtson v. G. & S. I. R. R. Co., 171 Miss. 628, 158 So. 350; Saxton v. Rose, supra; Olszewski v. United Fruit Co., 34 Fed. Supp. 113; Parker v. Loving & Co., 13 Ga. App. 284, 79 S. E. 77; Artificial Ice & Cold Storage Co. v. Martin, (Ind.) 198 N. E. 446; Higman v. Camody, (Ala.) 20 So. 480; Annos. 31 A. L. R. 546 and 19 L. R. A. 283.

Applying these principles to the facts of this case, it will be noted that as soon as plaintiff drove the car away from the Drive-It place of business he noticed it was shimmying. His brother testified it shimmied at a speed of ten miles per hour, which became worse as the speed of the car increased, and that it was difficult to keep it in the road. This brother testified also that plaintiff drove around fifty-five miles per hour. When plaintiff returned to Jackson the night of January 14th he could have notified Drive-It of the condition of the car. He did not do that. Instead, he begins a journey to Laurel, one hundred and seventy miles round trip. He does not leave Laurel until near midnight. There was then a heavy fog. The circumstances surrounding this accident clearly prove that plaintiff was running at a rapid speed. And there is no certainty whatever as to whether the wreck was caused by the speed or the defective steering. We are assuming the defective steering caused it. Plain-

tiff not only did not notify Drive-It of the defect, as was his duty to do, but he made no attempt to have the car examined and the defect remedied by some mechanic, as ordinary precaution suggested. He said he had owned and operated a number of "shimmying" cars. He knew the danger in operating them. He had testified he owned one about in the condition of this Plymouth, which left the highway, ran into the yard and up the steps of a nearby residence. His defense here is that he had rented cars from Drive-It before and all the cars had been in first class condition; that Drive-It was a reputable concern and he presumed they had furnished him a safe car. It is most likely Drive-It knew nothing of the defect. Mauldin, the mechanic, had said this condition could develop suddenly and without warning. But plaintiff did know about it, and, of course, had no right to rely upon the belief the vehicle was safe when he knew it was dangerous. Besides, he could hardly expect the trial judge to be so gullible as to believe his statement that he thought the vehicle was safe when every fact and circumstance showed he knew it was not safe.

Affirmed.

*Hall, Lee, Kyle* and *Holmes, JJ.,* concur.