**SOUTHERN NATURAL GAS COM-
PANY, Appellant,**

v.

Clyde WILSON and Index Drilling Com-
pany, Inc., Appellees.

**SOUTHERN NATURAL GAS COM-
PANY, Appellant,**

v.

Cammie L. WILSON and Index Drilling
Company, Inc., Appellees.

No. 19158.

United States Court of Appeals
Fifth Circuit.

May 17, 1962.

254

Erskine W. Wells, Earl T. Thomas, W. C. Wells, III, Jack W. Brand, Jackson, Miss., Wells, Thomas & Wells, Lipscomb & Barksdale, Jackson, Miss., of counsel, for appellant.

W. B. Fontaine, Elizabeth Grayson, Shelby R. Rogers, Swep S. Taylor, Jr., Jackson, Miss., James D. Hester, Laurel, Miss., Watkins & Eager, Jackson, Miss., of counsel, for plaintiffs-appellees.

Carroll Gartin, Charles W. Pickering, Laurel, Miss., Gartin & Hester, Laurel, Miss., of counsel, for third party defendant-appellee.

Before TUTTLE, Chief Judge, and RIVES and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This appeal presents another difficult question as to the liability vel non of a contractee to employees of an independent contractor, and also a question of the contractee's right of indemnity from the independent contractor.

Southern Natural Gas Company (hereafter Southern) appeals from judgments entered against it upon a jury verdict in favor of Clyde Wilson (hereafter Clyde) in the amount of $125,000.00, and in favor of Clyde's brother, Cammie L. Wilson (hereafter Cammie), in the amount of $3,000.00, and from a judgment dismissing with prejudice the third-party defendant, Index Drilling Company (hereafter Index).

Southern, being the owner of a mineral lease in Franklin County, Mississippi, entered into a contract with Index for the drilling of a well for oil and gas. Clyde and Cammie were employees of the independent contractor Index. Clyde was seriously burned on the derrick floor of the well; and Cammie, in coming to Clyde's rescue, suffered minor burns.

The contract between Southern and Index for the drilling of the well provided that Index should begin drilling on August 20, 1957 and prosecute the drilling with diligence to a depth of 11,000 feet, referred to as the "contract depth." Southern reserved the right to have the well abandoned or completed at a lesser depth. At 10,800 feet Southern ordered the regular drilling stopped in order to try to bring the well in as a producer. That was on September 23, 1957.

Up until that time (and except for a few occasions not here material) Southern paid Index at the rate of $6.00 per lineal foot drilled. From September 23 on Index was paid at day work rates. After that date Southern contracted with some 37 different companies to do special operations on the well, with Index cooperating in the services. Up until acceptable depth was reached, Southern's representative, Mr. E. R. Jordan, was at the well site from time to time, or irregularly. Southern retained some super-vision during that period, including the right to require Index from time to time to bring up bottom hole samples satisfactory to Southern and to "do such coring as the Company may specify" and to make or to "permit the Company to make, such drill stem tests, electrical surveys, radioactive surveys, analysis of mud returns and such other tests as the Company may specify" and to "do such washing, perforating, acidizing, swabbing, bailing, cleaning and similar work as the Company may specify."

After September 23, Southern's representative, Mr. Jordan, stayed at the well site most of the time and worked regularly 16 hours per day. Mr. Jordan gave general orders for ultimate results he wanted achieved to the tool pusher, Index's head man on the job, or, in his absence, to the driller. The driller was the foreman over a crew of five men on a shift. After September 23, Index worked around the clock and had three shifts of crews each day. The tool pusher generally gave the orders and directions to the driller. Between September 23 and the time of the accident, Southern had repeatedly, some 27 different times, brought in other independent contractors to make various tests and to help bring the well in as a producer. The operation continued in this manner until the well was eventually abandoned on October 30.

The derrick floor where the driller operates the machinery was about 30 feet square and approximately 12 feet above the ground. There was a lower platform near the ground on which the motors were placed. Several sets of steps led to the derrick platform. The machinery and works took up about half of the derrick floor. Mud was almost constantly about the derrick floor, and was usually removed with water pressure. The floor was generally covered with oil or grease, which was occasionally removed by some form of detergent, or gasoline, kerosene, or diesel fuel.

The accident occurred between 3:00 A.M. and 4:30 A.M. on October 20, 1957. Clyde Wilson, the one badly burned, had started to work for Index on October 11,

1957; he was nineteen years of age and an inexperienced oil field worker, having worked thirteen days for one oil company and seven days for another before coming to work for Index nine days before the accident. Cammie was the older brother, 29 years of age, and had considerable oil field experience. Clyde testified that his only experience with a fire in a can of diesel oil was several nights after he started to work for Index when he tried to light such a fire by throwing matches into the can. The driller came up, told him to get a piece of rope and dip it in the can, and showed him how to light the fire. On that occasion the can was on the ground behind the dog house.

On the occasion of the accident, Clyde and Cammie Wilson had the "midnight tour," starting at 11:00 P.M. on October 19 and were to work until 7:00 A.M. on October 20. When they arrived for this tour there was a five gallon bucket on the derrick floor containing diesel oil which had been on fire and was then smoking. Later the fire in the bucket was either re-ignited or blazed up. Who placed the bucket there or set it on fire is not known. Clyde denied emphatically that he did, or that he took any diesel oil up to the derrick floor. This was the first time that Clyde had seen an open fire on the derrick floor.

Southern's representative, Mr. Jordan, had occasion to be on the derrick floor briefly on several occasions on the night of the accident while the fire was burning in the bucket. He gave no orders with respect to the fire.

Just prior to the accident, the driller had instructed Clyde to wash off the grease on the tools on the derrick floor with diesel oil. Both the floor and Clyde's clothes had become soaked with oil and grease.

Cammie testified that diesel oil is a peculiarly dangerous fuel for an open fire because flames leap out as much as 8 or 10 feet, much further than from a wood fire. Clyde knew that he had oil and grease on his clothes, that the floor was greasy and oily, and that the bucket of fire was on the derrick floor. He was not familiar, however, with the special properties of diesel oil.

Shortly before the accident, the driller had told Clyde to go down and check the mud.

"Q. And what did you do after you got through checking the mud?

"A. I came back up and reported to him what I had found, and he said it wasn't right.

"Q. Where were you standing when you were making this report?

"A. I was standing approximately three feet from the driller, and he was at his controls.

"Q. And where was the fire bucket?

"A. Directly in front of me, about two feet from where I was standing, maybe three.

"Q. Do you understand,—can you visualize this diagram as being a diagram of the floor of the rig there that night?

"A. Yes, sir.

"Q. I want you to point out for the benefit of the jury, approximately where you were standing while you were reporting to the driller,— where was the can and where were you?

"A. The can was sitting somewhere along here, and I was standing over here, (indicating) between this post here and the driller,—I was on the other side of the post.

* * * * * *

"Q. Now, how did you first notice,—what did you first notice, how did you first find out you were on fire?

"A. I happened to look down at my pants, I felt some heat, and I looked down at my pants leg, and they were blazing up.

"Q. What happened then?

"A. I started backing up away from the fire slapping at the fire trying to put it out.

"Q. What happened then?

"A. Then my brother ran over and threw me on the floor, and was slapping at the fire and tearing at my pants leg, trying to tear my pants.

\* \* \* \* \* \*

"Q. All right now, go ahead and just tell the jury what happened after you caught fire.

"A. Well, while I was laying on the floor, my brother was trying to put the fire out, and and somehow this other can of diesel fuel got turned over, and there was a big explosion, and it was all over my pants, and shirt and everything was on fire. I turned around and I started to run, my brother was running after me, and I noticed his clothes were on fire and I was trying to put them out, and I figured I was already done for, so I was trying to put the fire out on him, and somebody else put his out, and I took off running trying to find a creek to jump in in the woods, and somebody caught up with me and put the fire out on me."

Cammie gave a similar description of the tragic accident. Clyde was burned over the greater part of his body, and was saved from death only by the skill of his physicians. His pain and suffering were intensive and long-continued, and his permanent injuries are extremely severe. Cammie suffered severe pain and injuries to his hands and arms.

Clyde and Cammie, as employees of Index, received Mississippi Workmen's Compensation benefits in the amounts of $200.00 for Cammie and $3,950.00 for Clyde. Clyde was still being paid compensation in the amount of $50.00 every two weeks. In addition, Index's compensation insurer paid medical expenses for Cammie in the amount of $1,137.20 and for Clyde in the amount of $14,520.30.

Under the Mississippi Statute,[1] the acceptance of benefits does not affect the right of the employee to sue any party other than the employer for his injury, subject to the right of the employer or his insurer to intervene and seek repayment of the amounts paid as compensation and medical expenses.

The basis upon which liability is sought to be fastened on Southern is pretty well stated in paragraph 7 of Clyde's complaint:

"That on or about three a. m. on the morning of October 20, 1957, at the time when defendant had assumed full control, direction, supervision and management of the hole and derrick and taken over full control of and use of the premises and at a time when plaintiff was necessarily on said derrick awaiting decisions of and direction from defendant, the defendant permitted said open oil drum with burning *diesel* (sic) fuel therein to be on said derrick floor as aforesaid with no fire fighting equipment on or about said rig."

By amendment there was added to that paragraph of Clyde's complaint:

"That the presence of said open fire on the derrick floor of the drilling rig constituted a dangerous fire hazard and constituted a violation by defendant of Rule 16 of the Statewide Rules and Regulations of the Mississippi State Oil and Gas Board.
\* \* \*"

The rule referred to in this amendment reads in part:

"RULE 16 *Fire Hazards*

"(a) Anything that might constitute a fire hazard and which is not used, or useful, in the operation of the well, tanks, separator or other equipment shall be removed to a distance of at least 100 feet from the well location, tanks and separators."

If further statements of the facts are needed they may be more appropriately made in considering Southern's conten-

1. Sec. 6998-36, Mississippi Code of 1942, Annotated, Vol. 5A, Recompiled.

tions on appeal, which are six in number, viz.: I. Southern was entitled to judgments non obstante veredicto; II. The district court erred in the way it handled Rule 16(a) of the Mississippi Oil & Gas Board; III. The jury was not properly instructed; IV. Plaintiffs assumed the risks which caused their injuries; V. The verdicts are excessive; VI. The district court erred in sustaining Index's motion to be dismissed as third-party defendant.

## I. JUDGMENTS NON OBSTANTE VEREDICTO.

■ The elementary and long-established general rule is that the employer of an independent contractor has no vicarious responsibility for the contractor's torts. The commonly accepted reason is that "since the employer has no right of control over the manner in which the work is to be done, it is to be regarded as the contractor's own enterprise, and he, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk, and administering and distributing it." Prosser on Torts, 2d ed., p. 357. That much is, of course, conceded. Liability of one who hires an independent contractor to the employees of that contractor must be based on his own negligence. That negligence in turn must result from the breach of some duty owed to the employees of the independent contractor.

To establish Southern's duty to the employees of Index, the plaintiffs undertook to prove that Index was doing work for Southern on land in the possession of Southern, and that Southern had retained or assumed control over the premises or the general operations of Index, or was jointly using the premises with Index. The evidence which has been recited made a very strong showing of the existence of those facts, especially when it is considered that between September 23 and October 20, the date of the accident, on some 27 different occasions Southern had brought other independent contractors in on the derrick floor to make tests and to help bring the well

in as a producer. The legal duty thus established is the same as that recognized by this Court in a case governed by Texas law:

"We agree with the lower court's holding: that, if Sunray retained control over the premises and the derrick, it was bound to exercise reasonable care to maintain the derrick in safe condition for use; and that there was substantial evidence to support its finding that Sunray did retain such control. * * *

"The crucial question as to liability on this appeal is whether the appellant retained control of the derrick at the time of its fall. * *

\* \* \* \* \* \*

" * * * Other independent contractors were performing work for Sunray under the derrick at the time it fell, and the latter's superintendent at the same time was supervising the whole operation. The trial court's finding, that Sunray had not surrendered control of the derrick to appellee's employer, is supported by substantial evidence and should not be set aside as clearly erroneous. It appearing from the working arrangement that the derrick remained under the control of appellant, and the appellee being an invitee as aforesaid, it follows that appellant was under the legal duty to exercise ordinary care to keep the premises, including the derrick, in a reasonably safe condition for appellee's use."

Sunray Oil Corporation v. Allbritton, 5 Cir., 1951, 187 F.2d 475, 476, 477.

■ Southern having retained or assumed control over the derrick floor, and Clyde's duties in furtherance of Southern's business having required him to be on and about the derrick floor, Southern owed him a duty more extensive than that owed to an ordinary invitee. Sun Oil Co. v. Pierce, 5 Cir., 1955, 224 F.2d 580, 585; accord Reed v. New Orleans Great Northern R. Co., 1934, 170 Miss. 296, 151 So. 553, 555; compare Lan-

caster v. Lancaster, 1952, 213 Miss. 536, 57 So.2d 302, 305. At the time of the accident Southern owed a duty to Clyde to see that the derrick floor was maintained in reasonably safe condition for his use.

There was substantial evidence to support the verdict of the jury that Southern failed to perform that duty. Southern's representative, Mr. Jordan, knew of the bucket of fire on the derrick floor and failed to order its removal. Unless Clyde assumed the risk, a question to be discussed hereafter, Southern's negligence was the proximate cause of the severe injuries sustained by Clyde.

The duty owed to Cammie, the older brother, was no less than that owed to Clyde. True, Cammie was experienced and appreciated the danger, but he acted in an extreme emergency brought on by Southern's negligence and the jury might well determine that he had a right to take the risk to save the life of his brother.

■ We conclude that there was ample evidence that Southern breached a duty owed to the plaintiffs, as employees of Index, and that the district court properly denied Southern's motions for directed verdicts and for verdicts non obstante veredicto.

## II. RULE 16 OF THE MISSISSIPPI OIL & GAS BOARD.

■ Southern admitted, "subject to all pertinent objections to admissibility which may be interposed at the trial," in its answers to requests for admissions under Rule 36, Federal Rules of Civil Procedure, "that said Rule 16 was adopted by the Mississippi Oil & Gas Board on November 19, 1951, and that same was in effect on or about October 20, 1957." Southern however objected to the introduction of the rule in evidence, but solely on the ground that "the rule on its face applies only to producing oil and gas wells, and not to nonproducing oil and gas wells." For convenience, and at the expense of repetition, we quote the rule.

"RULE 16 *Fire Hazards*

"(a) Anything that might constitute a fire hazard and which is not used, or useful, in the operation of the well, tanks, separator or other equipment shall be removed to a distance of at least 100 feet from the well location, tanks and separators. All heaters, treaters and other fired vessels shall be located at least 100 feet from all vessels handling or storing crude oil.

"(b) All open hole drill stem tests shall be completed in the daylight hours before sunset. No well shall be swabbed into production except during daylight hours, except in known low pressure areas.

"(c) Oil shall not be stored in earthen reservoirs or in open receptacles."

We see nothing on the face of this rule to limit it to producing wells. To the contrary, it apparently applies to any "well location." That construction of subdivision (a) is strengthened by the fact that subdivision (b) very clearly applies to wells while being drilled. The district court did not err in overruling Southern's objection to the admission of Rule 16.

After the plaintiffs rested, Southern called Mr. James F. Borthwick, Jr., Chief Engineer for the Mississippi State Oil & Gas Board, who testified that he is charged with the responsibility of enforcing the Board's regulations, and in answer to a question as to "what is the practical construction placed on Rule 16A of the statewide rules and regulations of the Mississippi Oil & Gas Board as regards wells which have been drilled, but have not been completed as producers," stated:

"A. Rule 16 deals with fire hazards. Paragraph A states that anything that might constitute a fire hazard which is not used or useful in the operation of a well, tanks, separators, or other equipment, shall be moved to a distance of at least 100

feet from the well location, tanks, and separators. All heaters, treaters, and other fired vessels shall be located at least 100 feet from all vessels handling or storing of crude oil. The interpretation of the latter, this deals with the completed well in a proved field, that any fired vessels which might constitute or any apparatus that would constitute a fire hazard, has to be at least 100 feet from the well head."

On cross-examination Mr. Borthwick testified that the Board itself had never had an occasion to make a decision to that effect or to rule on the question, that the investigation and checking of equipment in producing areas was handled by the Board's staff, that his testimony merely expressed his personal opinion, and, "Q. You never had to decide the issue at all? A. No, I have not."

■ Mr. Borthwick's testimony was of no value to establish an administrative construction of the rule. Administrative construction can be established only by actual ruling or conduct and certainly not by the mere personal opinion of an administrator. That opinion may possibly have been admissible to aid the court or jury, but it could not be binding or conclusive.

"While facts in possession of a witness throwing light on the construction of a statute are material, his opinion as to the legal effect of words used in the statute is not controlling, or even material, and, in the absence of any technical definition of words used, the meaning thereof should not be controlled, as against their general and commonly accepted meaning, by testimony as to what witnesses understood thereby."

82 C.J.S. Statutes § 361, p. 793. See also, 1 Davis Administrative Law Treatise § 506.

Southern insists, however, that the statute pursuant to which the Oil and Gas Board was created, Section 6132–01 through 6132–51, Mississippi Code Annotated (1942) as amended by Mississippi Laws 1948, ch. 256, shows that the only persons sought to be protected from fire hazards were the owners of the oil and gas underneath the surface, and that Rule 16(a) can have no application to a personal injury case. That construction of the Mississippi statutes is vigorously disputed by the appellees. We do not feel called on to decide the question because, as has been pointed out, the only ground of objection to the admissibility of the rule was that "the rule on its face applies only to producing oil and gas wells, and not to nonproducing wells."

Southern insists that the district court instructed the jury that a violation of Rule 16(a) might constitute negligence in and of itself, and that this was error, and further that the applicability of the rule should have been determined by the court rather than by the jury. The instructions given by the court to the jury with reference to Rule 16(a) were a part of its oral charge and read as follows:

"Now, you heard a good deal in the trial, gentlemen of the jury, about this Rule 16A of the Statewide Rules and Regulations of the Mississippi State Oil and Gas Board. This paper will be one of the documents that you can carry back to the jury room with you. And in regard to this Rule 16A, I wish to advise you as follows:

"Whether or not the violations of the terms of this rule is negligence in and of itself alone, depends upon all the circumstances as shown in the evidence. Sometimes it may be negligence in and of itself to violate a rule such as this, and in other cases, the doctrine well is that not only must the violation of the rule be looked to, but the jury must believe by preponderance of the evidence that the violation was the proximate cause of the damages suffered by the other party.

"Now, you have heard the evidence as to that rule. There was some

contradictory evidence and that is for your consideration,—contradictory from the standpoint of whether that rule is applicable only to a well that is producing or whether it is applicable to a well while it is being drilled. You have heard the conflicting evidence as to that.

"If you find that the rule is to be applied and should be considered by you, why then I've charged you the rule of law in regard to a rule of that type and how you should consider it in connection with your deliberations on the case."

Southern's objection to that part of the charge was in the following language.

"The Southern Natural Gas Company further excepts to the court's charge to the jury to the effect that there had been contraditory evidence respecting the meaning of Rule 16A of the Statewide Oil and Gas Board Rules and Regulations, for the reason that and we submit that there was no evidence introduced by the plaintiff in contradiction to the defendant's evidence regarding the meaning of Rule 16A."

■■ What has already been said is enough to show that that objection was not well taken. In the absence of plain error no other objection should be considered by this Court. Rule 51, Federal Rules of Civil Procedure, 28 U.S.C.A. Far from finding plain error, we are inclined to view the instructions as harmless. It appears to us that Rule 16(a) was not needed to establish the fact that the presence of the open bucket of flaming diesel oil on the derrick floor constituted a dangerous fire hazard. See Rule 61, Federal Rules of Civil Procedure.

III. OTHER JURY INSTRUCTIONS.

The court's instructions to the jury respecting Southern's duty to furnish the employees of Index a reasonably safe place to work were as follows:

"The court instructs the jury that when an owner of premises employs an independent contractor to perform work for him thereon, that if the said owner did assume some control over or supervision of the premises, or generally of the operations, that then the owner owes to the employees of the independent contractor, the duty to use reasonable or ordinary care to keep the premises in a reasonably safe condition for the servants or employees of the contractor.

"If you find from the preponderance of the evidence in this case that Clyde Wilson was a servant of Index Drilling Company and not a servant of Southern Natural Gas Company, but that Southern Natural Gas Company did, during the early morning hours of October 20, 1957, have some control over or supervision of the derrick, or generally of the operations thereon, and if you further believe from a preponderance of the evidence in this cause that the presence of the can of burning diesel oil on the derrick floor was hazardous and that the Southern Natural Gas Company had knowledge or should have had knowledge of the presence of said fire, and if you further believe from preponderance of the evidence in the case that the permitting of the presence of such a fire and the failure to require the removal of such a fire from the derrick floor was a failure on the part of Southern Natural Gas Company to use reasonable or ordinary care to keep the premises in a reasonably safe condition for the plaintiffs, and if you further believe from a preponderance of the evidence that the presence of the can of burning diesel fuel oil on the derrick was a proximate or efficient cause of the injuries to Clyde Wilson, then you may bring in a verdict for Clyde Wilson. And that same charge, while I have used the word Clyde, refers to the other Wilson boy, too."

■ Southern's failure to object to these instructions, insofar as they represented written requests of the plaintiffs

or the refusal of such requests on the part of Southern, does not prevent it from insisting on error upon appeal because the district court expressly granted such objections and declined to hear reasons for the objections.[2]

The district court's oral instructions which have been quoted were taken from the plaintiffs' request No. 1, which the court marked, "Given in part, refused in part." We therefore treat Southern's insistence on error as to those instructions as if it had objected and stated the grounds of its objection as required by Rule 51.

Some of Southern's criticisms of the court's charge are sufficiently answered by what has already been said. That is not true, however, as to Southern's strongest criticism of the charge which is directed to the predicate for the imposition of a duty upon Southern, namely: " * * * if the said owner did assume some control over or supervision of the premises, or generally of the operations. * * * "

We agree that it is not sufficient to impose a duty on the contractee that it retains or assumes "some control over or supervision of the premises or generally of the operations." In cases governed by Texas law, this Court has held that in the absence of any actual control of the operation, or of any reserved right of control more than deemed necessary to secure the satisfactory completion of the work, an employee of an independent contractor owes no duty to the contractor's employees to inspect or supervise the installation or operation of machinery furnished by the contractor. Sword v. Gulf Oil Corporation, 5 Cir., 1958, 251 F.2d 829; Hurst v. Gulf Oil Corporation, 5 Cir., 1958, 251 F.2d 836. The same rule appears to prevail in Mississippi. See Cook v. Wright, 1937, 177 Miss. 644, 171 So. 686, 691. At the other extreme, where the employer of the independent contractor assumes control or direction of the method of performing the work, the relation of employer and independent contractor is changed to that of master and servant. See 57

2. In compliance with Rule 51, Federal Rules of Civil Procedure, the district court afforded opportunity to make objections to its charge out of the hearing of the jury, but announced:

"In regard to the written request for instructions to the action of the court, an exception is automatically noted in favor of the party against whom the ruling is. In other words, as to the plaintiff, the nongiving of any requests or the giving of the requests in modified form, an exception is noted in favor of the plaintiff and likewise, an exception is noted for the defendant after the action of the court on the plaintiff's request, and likewise, as to the defendant, an exception is automatically noted for the defendant as to the nongiving of any requested charge, and to the other parties,—to the plaintiff to the giving of same.

"Now, in addition to those exceptions which are automatically noted in the record, are there any further requests or exceptions to the oral charge that has been given to the jury. I will hear from you at this time,—first from the plaintiff.

"BY MR. WELLS:

"Do I understand the court that they are already in the record?

"BY THE COURT:

"The exceptions are,— —I'm handing them to the clerk. They are given to the clerk now, all of the requested instructions, and I have noted marginally the action of the court, and I have announced that an exception is granted to all parties as to adverse rulings on those requested requests. Now then, in addition to those which are automatically given, do the counsel wish to request further instructions or to except to the oral charge that was given to the jury.

"In order that there may be no misunderstanding respecting the court's position as regards written requests for charges which were submitted to the court, the court states for the record that exceptions have been and are granted to all parties respectively to all rulings on written requested charges which are in effect adverse to them, not only to those written requests for charges which were refused, but also as to each of the written requests for charges which were granted by the court in whole or in part. And the court does not desire counsel to assign their reasons for any exceptions to any charges, both as to written requests submitted before argument, and to any exceptions to the oral charges."

C.J.S. Master & Servant § 596. Between these two extremes, under the facts of the present case, the only liability of Southern to employees of Index would appear to be for the exercise of its control of the derrick floor at the time of the accident.

The evidence establishes that from September 23 on Southern was bringing many other independent contractors in to try to bring the well in as a producer, and was using the derrick floor under the supervision of its representative, Mr. Jordan. We are persuaded that the evidence shows such substantial control of the premises by Southern at the time of the accident as to prevent the errors in the court's charge from affecting substantial rights of the parties, and thus from requiring a reversal. Rule 61, Federal Rules of Civil Procedure.

■ The district court refused to instruct the jury, as requested by Southern, that it was Index's duty to furnish a heater to provide warmth for its employees and to furnish adequate fire-fighting equipment. Index was bound by its contract with Southern to furnish all equipment required or incidental to the drilling of the well and to "take suitable precautions for prevention of fires." At the time of and prior to the accident, however, Southern knew that Index had failed to furnish any heater or fire-fighting equipment on the derrick floor, and knew of the presence there of the open bucket of flaming diesel oil. Under those circumstances, Southern's contract with Index does not shield it from liability for failure to perform its own duty to provide Index's employees a reasonably safe place to work.

We find no reversible error in the district court's refusal of other charges requested by Southern; nor do we agree with Southern that the oral charge was biased in favor of the plaintiffs.

IV. ASSUMPTION OF RISK.

■ Assumption of risk has been abrogated as a defense in Mississippi as between master and servant. Section 1456, Mississippi Code Annotated (1942).

In other relationships, however, the doctrine remains in full force. McDonald v. Wilmut Gas & Oil Co., 1937, 180 Miss. 350, 176 So. 395; Runnels v. Dixie Drive-It-Yourself System Jackson Co., Miss. 1954, 220 Miss. 678, 71 So.2d 453, 46 A.L.R.2d 397. In an action by an employee of an independent contractor against the contractee it is a valid defense that the condition by which the injury was occasioned was known to and appreciated by the plaintiff. 35 Am.Jur., Master & Servant § 293, pp. 216–217; Annotation 44 A.L.R. 1122–1124; cf. 65 C.J.S. Negligence § 50, pp. 541–543.

■ The fire in the bucket of diesel oil on the derrick floor was, of course, obvious to and known by both Clyde and Cammie. Clyde, however, had been on the job only nine days and had very little experience in oil field work. He was only nineteen years old. Dave Lovett, another roughneck employed by Index, testified that he had cautioned the plaintiffs about getting close to a fire because their clothes were greasy, and E. E. Thompson, another roughneck, testified that when Clyde started to pour oil on the fire can he told him that he had better let him, Thompson, pour the diesel in the fire because "you've got diesel on your pants leg." Clyde and Cammie Wilson testified to the contrary of Lovett and Thompson. Credibility was, of course, for the jury. There was evidence from which the jury could reasonably believe that Clyde did not appreciate the peculiar properties of a diesel oil fire and the dangers therefrom. He would not assume the risk unless he not only knew the condition, but appreciated the danger, and with such knowledge and appreciation voluntarily exposed himself to the risk. 4-County Electric Power Ass'n v. Clardy, 1954, 221 Miss. 403, 73 So.2d 144, 149, 44 A.L.R.2d 1191; Strand Enterprises v. Turner, 1955, 223 Miss. 588, 78 So.2d 769, 773, 47 A.L.R.2d 1431; Gulf Refining Co. v. Williams, 1938, 183 Miss. 723, 185 So. 234, 236; Bradford v. Taylor, 1905, 85 Miss. 409, 37 So. 812, 813. As to Clyde, the defense of assumption of risk was properly submitted to the jury,

and the jury could properly and reasonably conclude that the defense had not been established.

Cammie stands in like situation, and the same thing holds true as to him. Cammie was a mature man and an experienced oil worker, but if the jury believed that he acted in an emergency brought on by Southern's negligence and for the purpose of saving his brother's life, they could properly find that Cammie did not voluntarily assume the risk of injury.

## V. EXCESSIVE DAMAGES.

■■■ Contributory negligence is not a complete defense in Mississippi, but the jury should diminish the recovery to the extent of any contributory negligence. Mississippi Code 1942, § 1454. The jury could reasonably have found the defense of contributory negligence not established as to one or both plaintiffs, or they could have taken any contributory negligence into consideration in arriving at the amounts of their verdicts. The painful, severe, and permanent injuries suffered by Clyde, his large medical expenses, $14,520.30 already accrued, and his present and probable future loss of pay would sustain an extremely large verdict. Cammie's recovery was moderate. Under the rule prevailing in the federal courts, we cannot say that the district court abused its discretion in denying the motion for new trial which claimed that the damages were excessive. Whiteman v. Petrie, 5 Cir., 1955, 220 F.2d 914, 919; Dagnello v. Long Island R. Co., 2d Cir., 1961, 289 F.2d 797; 3 Barron & Holtzoff, Federal Practice & Procedure, Rules Edition, § 1302.1, pp. 348–352.

We conclude that the judgments of Clyde Wilson and of Cammie Wilson against Southern should be and are affirmed, and proceed to a consideration of the dismissal of Index as third-party defendant.

## VI. SUSTAINING INDEX'S MOTION TO BE DISMISSED.

By its third-party complaint against Index, Southern claimed that under the terms of the drilling contract, Southern was entitled to complete indemnity from Index. Index admitted the terms of the contract but denied that Southern was entitled to indemnity. At the conclusion of the evidence the district court sustained Index's motion to be dismissed as third-party defendant, explaining that it was of the opinion that the motion was well taken "within the framework" of the third defense asserted by Index. That defense reads as follows:

### "THIRD DEFENSE

"Without admitting that Plaintiff, Clyde Wilson, was injured in the manner set forth in his Complaint, this Third-Party Defendant says that if the Plaintiff did sustain injuries as a result of the matters and things set forth in his Complaint, that the Third-Party Plaintiff, Southern Natural Gas Company, breached the terms of the drilling contract referred to in Second Defense hereof by disturbing and abrogating the master-servant relationship which existed between the Plaintiff and this Third-Party Defendant and, in such event, this Third-Party Defendant has not agreed, under the terms of said drilling contract, to indemnify the Defendant and Third-Party Plaintiff, Southern Natural Gas Company, for liability, if any, thus created."

The district court said:

"The evidence insofar as this motion is concerned shows that the drilling crew were employees of Index, and that up to a certain date, I think it was September 23, 1957, that the Natural Gas Company paid Index, the contractor, on a certain basis, and that after that date, the method by which the amount paid by Southern Gas to Index was determined by Paragraph 16 of the contract, wherein the subject matter was day work.

"The evidence is to the effect that the members of the drilling crew continued to get their compensation

from Index, but that the Gas Company paid Index the amount provided for in the contract for the type of work that was done after that date, September 23, 1957, and I am of the opinion that the evidence in the case is to the effect that the supervision of the activities of the drilling crew were so much to the extent, a large extent at least, if not fully under the control of Mr. Jordan, who was the,—Mr. Jordan, and sometimes Mr. Lyons. But in connection with the Gas Company calling in these specialists who, as the evidence shows, brought crews with them, I think a fair conclusion from full consideration of the evidence is that the crews of the special service people were confined to the activities of the special service people, and that members of the drill crew who were employees of Index were working in connection with what was necessary in further drilling operations, were all under the control or supervision of the Gas Company.

"So, for that reason, the defense set up in Defense No. 3 filed by the Index Drilling Company to the third party complainant of Natural Gas appeals to the court very strongly. It is the subject matter of that third defense, but it isn't exactly the essence of the third defense, but it rather prompts the thought that has appealed to the court. This third defense is without admitting that plaintiff was injured in the manner set forth in the complaint, Index says that if the Wilsons did sustain injuries that the Gas Company breached the terms of the drilling contract referred to in disturbing and abrogating the master servant relationship which existed between the plaintiff, it states here,—I think that really means the third party plaintiff and this third party defendant,—and in such events, this third party defendant has not agreed under the terms of the drilling contract to indemnify Southern Natural

Gas for liability, if any, thus created.

"It is not the court's view that as stated, the defense is the one upon which the court rules that the motion should be granted, but rather it is that at the time that the two Wilsons were burned, that the employees of Index were under the supervision and the control. of the Gas Company through Mr. Jordan's representation of the Gas Company, and at some times, this other gentleman being present also. And I think the evidence, as I have thus indicated, undermines completely the position taken by Southern Natural Gas as a third party complainant against Index. So for those reasons, the motion is granted."

 It will be noted that when the district court sustained Index's motion and dismissed Index as a third-party defendant, Southern had not moved for a directed verdict against Index. Under that procedural situation the question of whether, as a matter of law, Index is liable to indemnify Southern is not presented on this appeal. We do not pass on whether there was any substantial evidence that Southern interfered with or disturbed the master-servant relationship existing between the plaintiffs and Index. Certainly, Index's "Third Defense" was not established conclusively and as a matter of law.

This Court has recently noted that the strict rule, that in order to indemnify against liability for losses caused by the indemnitee's own negligence the contract must expressly so provide, is giving way to the modern practice of bargaining as to which party shall bear the expense of liability insurance. Jacksonville Terminal Co. v. Railway Express Agency, 5 Cir., 1962, 296 F.2d 256, 262, 263; Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp. et al., 5 Cir., 303 F.2d 237, 243. In the latter case we quoted with approval from the annotation in 175 A.L.R. at p. 29, that: "The cardinal rule of interpretation of indemnity contracts is the same as in the case of other types

of contracts, namely, the ascertainment of the intention of the parties."

The contract between Southern and Index required Index to provide workmen's compensation insurance and general public liability, but also provided that Index's insurance shall not be "held to waive any of the provisions of this Contract with respect to the liability of the Contractor (Index) or otherwise." [3]

Under paragraph 2 of the contract Index was obligated to furnish all equipment, supplies, etc. required for the drilling, and it was provided that the equipment "shall be adequate in every respect." That paragraph further provided that "each employee of Contractor shall be experienced and thoroughly competent for performance of the duties to which he is assigned." Paragraphs 14 and 25 of the contract read as follows:

"14. SAFEGUARDS. All work of CONTRACTOR hereunder shall be performed, in a careful, safe and proper manner, in accordance with generally recognized standards and in the industry's practices. CONTRACTOR shall take care of all waste oil, water and mud accumulated in the course of drilling operations and shall prevent the escape thereof, and shall take suitable precautions for prevention of fires and explosions and make every reasonable effort to avoid damage to fences, structures, crops, timber and livestock. The COMPANY, at its own expense, shall pay for damages necessarily caused to crops and timber in performance of the work, but CONTRACTOR shall be responsible for, and shall indemnify the COMPANY against, any and all claims

for damage of any kind due to CONTRACTOR'S negligence.

\* \* \* \* \* \*

"25. COMPLIANCE WITH LAWS, ETC. All operations of CONTRACTOR hereunder shall be conducted in compliance with any and all laws, regulations or orders of governmental authority applicable thereto and CONTRACTOR shall indemnify the COMPANY against any and all liability or penalty of any kind that may be asserted against the COMPANY on account of CONTRACTOR'S failure, or alleged failure, to comply therewith. Without limiting the generality of the foregoing, CONTRACTOR shall pay any and all Federal or State taxes imposed upon or in respect of the wages or other compensation of CONTRACTOR'S employees, all of whom shall be deemed the employees of CONTRACTOR alone."

▇▇▇ Thus, Index had expressly agreed to indemnify Southern "against any and all claims for damage of any kind due to CONTRACTOR'S negligence" and "against any and all liability \* \* \* of any kind that may be asserted against the COMPANY on account of CONTRACTOR'S failure, or alleged failure, to comply therewith (with any and all laws, regulations or orders of governmental authority applicable \* \* \*)."

There was substantial evidence from which the jury could conclude that Index violated some or all of the foregoing provisions of the contract,[4] and perhaps other provisions. The district court erred in sustaining Index's motion to be dismissed as a third-party defendant.[5] The judgment dismissing Index is re-

---

3. In the drilling contract, Southern was referred to as "Company" and Index as "Contractor."

4. The third-party complaint was based entirely on contract and did not assert, except as bearing on a contract violation, any claim that Southern's negligence was passive and amounted to no more than a failure to guard against the results of

Index's active negligence. See Central Surety & Ins. Corp. v. Mississippi Export R. Co., 5 Cir. 1937, 91 F.2d 125, 126; 42 C.J.S. Indemnity § 27(b); cf. Halliburton Co., et al. v. Norton Drilling Co., et al., 5 Cir., 302 F.2d 431.

5. We deem it inappropriate upon this appeal to discuss the law governing indemnity more specifically or elaborately.

versed, and the cause as between Southern and Index is remanded for further proceedings. The costs of appeal are taxed one-half against Southern and one-half against Index, with the question reserved for decision on remand as to whether Index should indemnify Southern for its part of such costs.

Affirmed in part and reversed and remanded in part.